# Court of Appeals.

April 28, 1896.

## PEOPLE v. VINCENZO NINO.

**1. HOMICIDE—INSANITY.**

Where an indictment for murder of defendant's wife in which insanity is interposed as a defense, it appeared that he had been under the delusion that his wife was trying to kill him, exclusion of testimony as to what he had said regarding his wife the day before the homicide, is erroneous.

**2. TRIAL—OBJECTION—WAIVER.**

It is competent for the district attorney to waive the objection that the questions were leading, and he does so by failing to state any ground on which he rests his objection before the ruling of the court.

**3. HOMICIDE—INSANITY—EVIDENCE.**

Where it is asserted that the defendant has been continuously insane from a period of four months before the killing up to the time of the trial, and the examination of the experts is directed to his mental condition at the time they saw him, they are competent, from the conclusion they thus reached and the medical and other facts proved, to give on the trial an opinion as to his sanity or insanity at the time of the homicide.

**4. SAME.**

The jury are entitled to the facts on which an insanity expert bases his opinion and, when those facts are the result of his own interviews with the defendant, it is not only competent, but necessary, that they should be laid before the jury.

**5. SAME.**

If the defendant offers evidence tending to prove that he was insane at the time of the homicide, the legal presumption of sanity is rebutted, and the prosecution must prove sanity by preponderance of evidence.

**6. SAME.**

If the defendant's evidence creates, in the minds of the jury, a reasonable doubt as to his sanity at the time of killing, the prosecution must remove that doubt by preponderance of evidence.

Appeal from a judgment, convicting defendant of murder in the first degree.

Amos H. Evans, for appellant.

John D. Lindsay, for respondent.

BARTLETT, J.—The defendant has been convicted of killing his wife, and now rests under sentence of death. The material facts in the case may be briefly stated. The defendant is an illiterate Italian barber, of a low order of intelligence, who was married to the deceased, in this country, some eight or ten years prior to the homicide, and has resided here ever since, either in the city of New York or the city of Brooklyn. At the time of the tragedy the defendant lived, with his wife and two children, the latter aged six and eight years, respectively, at No. 55 Baxter street, in the city of New York. On the 19th of February, 1895, at about six o'clock in the morning, the defendant was found by some neighbors in the house, sitting on a lounge, in his outer or living room, a razor in his hand, and his children beside him, with nothing on but his shirt, which was covered with blood. There was also blood on the faces of the children. The police were summoned, and an officer asked the defendant where his wife was, and he replied she was dead in the other room. The deceased was found in the bedroom, partly clothed, sitting on the floor in one corner, dead. Her throat had been cut, and an examination of the body revealed a number of stabs and wounds. The defendant admitted when questioned by the officer, that he had killed his wife, and, when asked why he had committed the deed, stated that she had put bugs in his ears, poison in his coffee, tried to kill him, and contemplated going away with, as he expressed, it, "a bigger man worth ten thousand dollars." The only eyewitness of the homicide was the son of the defendant, Baptisto Nino, aged eight years, who was permitted by the court to give his evidence, not under oath, as provided by section 392 of the Code of Criminal Procedure. The child testified that his father killed the deceased in his presence. The defendant being poor, and unable to take charge of his own case, the court assigned him counsel, who have discharged the duty imposed upon them with fidelity and ability, interposing the sole defense of insanity.

It was claimed on behalf of the defendant that he was insane at least four months prior to the homicide, and that his mental malady had continued, without interruption, except a marked increase in violence of manifestations, up to the time of the trial. The theory of the defense was that the defendant existed in a de-

lusional state,—that is, his mind entertained false ideas about various things; that he was dominated and impelled by insane delusions, which led him to believe that his wife was seeking his life, and contemplating an elopement with a man of higher social and financial standing than that of her husband. It was in support of this theory of delusional insanity that all the evidence of the defense was offered, and this fact is to be kept in mind in considering the assignments of legal error now submitted for our consideration. The evidence of the defense is uncontradicted to the effect that a great change came over the defendant a few months before the homicide, and that he appeared to be haunted and pursued by delusions, suspicions, and fears; that his physical appearance greatly changed; and that he abandoned work for the alleged reason that his wife had tied his hands, and was exerting over him an influence that prevented him from working. As one witness stated, "He said his wife had done the thing to him." The witnesses were of a low order of intelligence, and their testimony was given by the aid of an interpreter, and it can only be inferred what this statement means; but, from various incidents in the record, it is reasonably apparent that the form of defendant's delusion in this connection was the belief that his wife exerted over him some malign power or spell that controlled and influenced him against his will. Without quoting from the evidence in detail, it was proven that this defendant, from about four months prior to the homicide up to the day before, had represented to a number of people that his wife had placed bugs in his ears for the purpose of making him ill and of killing him; that she had sucked blood from his ear while he slept; that she had placed blood and water in his body; that she had tied his hands, and prevented him from working; that she had placed blood upon the stove in order that he might die by that blood; that she had repeatedly tried to poison him. It also appeared that the defendant carried about with him a bottle of kerosene, from which he drank small quantities from time to time, in order to overcome the effect, as he explained, of the water that his wife had placed in his body, and he would also put some of the oil upon a cloth, and place it in his ears, for the purpose of getting rid of the bugs which his wife had deposited there during his sleep.

We have had our attention called to a large number of excep-
tions which, defendant's counsel insist, present legal error, and call
for a reversal of this judgment. After an examination of the
record, we have reached the conclusion that some of these excep-
tions disclose reversible error, and we will now point out those
upon which we rest this decision. There are a number of ex-
ceptions to the refusal of the learned recorder to admit evidence
offered in support of the theory of insane delusions. They are all
of a similar character, and may be considered together. The wife
of defendant's brother was on the stand, and testified at length on
this subject of delusions, and to conversations she had with de-
fendant on various occasions, from four months prior to the homi-
cide to a day or two before that event. After she had to some ex-
tent exhausted her recollection, she was asked by defendant's
counsel: "Did he say anything about kerosene?" This was ob-
jected to generally, and objection sustained. Witness then testi-
fied that defendant used to wet his forehead and temples with
kerosene, and she was asked: "Did you see him have a handker-
chief?" This was also ruled out under a general objection. The
witness then swore she had an interview with defendant two days
before the homicide, and she was asked: "Did he say anything
about his wife?" "Did you see him have the kerosene bottle at
that time?" "Did he say anything about the bedbugs in his head
at that time?" To all of these questions a general objection was
interposed and sustained. The witness then came to an interview
the day before the tragedy, and the same questions, substantially,
were asked, and ruled out on general objections. After all these
rulings had been made, the court stated that they were based upon
the ground that the questions were leading. It was competent for
the learned district attorney to waive this particular form of objec-
tion, and he did so by failing to state any ground on which he
rested his objections before the ruling of the court. We are, how-
ever, of the opinion that these questions were not, under the cir-
cumstances, leading, and the witness should have been permitted
to answer them. The interviews of the defendant with this wit-
ness were of the highest importance, and everything that he said
which was calculated to shed light on his mental condition was
most material. The error here committed was vital, and calculated

to greatly prejudice the rights of the defendant. It is impossible to say that the excluded evidence would not have benefited the defendant, especially when it is remembered that one of the rejected questions called for anything he might have said to witness in regard to his wife.

The next ground of error is found in the course of the examination of Dr. Charles L. Dana, an insanity expert, placed on the stand by the defendant. The witness had been asked, in substance, whether the defendant might not be simulating insanity, and the witness went on to state that he understood the delusions had been testified to by defendant's physician and others witnesses. The district attorney then said: "Not by a physician, but by a man who kept a dispensary,—a druggist." The witness then started in to complete his answer to the pending question, when the court interrupted, and said: "There has been no testimony of a physician on the subject." The record at the time contained the evidence of Dr. Elisio Marini, a witness for the defense, who testified, among other things, that he was a physician; that he had practiced in the city of New York for about 10 years, and that the defendant called upon him professionally about 22 days before the homicide, and again about 3 days later. The doctor swore the defendant complained of feeling something in his head, feeling dizzy, and on one occasion brought him a bug in a paper, saying he had found it in his ear that morning; then said, "Give me something for my head." On another occasion the defendant brought the doctor a piece of paper with some aniline wrapped up in it, and, when asked by the doctor what it was, said; "I've brought this out from my ear. It was blood sucked from my ear." The doctor also swears that he prescribed for the patient. The defendant's sister-in-law had also testified that, when defendant came to her house in Brooklyn, shortly before the homicide, he had something in a paper which he said was blood, and that he had shown it to Dr. Marini, "because the doctor might act as a witness in connection with that blood." In view of this state of the record, and the vital materiality of this evidence as tending to prove the defense of insane delusions, the defendant was entitled to have the statement of his physician presented to the jury, with whatever added weight it might receive in their minds by

reason of its professional source; and the declaration of the court, in the presence of the jury, that there had been no testimony of a physician on the subject was prejudicial error.

We now come to the consideration of the most important exception in the case relating to the exclusion of evidence. Dr. Charles H. Chetwood was sworn as a witness for the defense. He was an expert on insanity, and physician in the Tombs Prison. Dr. Chetwood and Dr. Dana were associated as experts for the defendant in the case. Dr. Chetwood had made an independent examination of the defendant while he was confined in the Tombs, and before the trial, in order to determine the question of his sanity, and later he made a joint examination of the defendant with Dr. Dana, having in view the same object. When Dr. Chetwood was on the stand, defendant's counsel was not permitted to prove by him the conversations he had with the defendant in the course of his professional examinations to test his mental condition. He was allowed to proved nearly all else that occurred at these interviews, but the conversations were repeatedly and completely excluded. It is not necessary to refer to the questions separately which raise this point. Such questions were asked as: "Please state what the conversation was." "What did you say to him?" "Was that an intelligent conversation?" "What did he say to you, doctor?" The district attorney objected to these and similar questions as incompetent, immaterial, and on the ground that the conversation is not evidence. We think these conversations were competent, and their exclusion reversible error. All that this defendant said and did during these several examinations by the experts was competent, as bearing upon his mental condition at the time he was examined. It is quite true that the declarations of a defendant to an expert on insanity, as to past transactions and events, are not competent evidence to determine his mental condition at some time previous to the examination. People v. Hawkins, 109 N. Y. 408, 17 N. E. 371; People v. Strait, 148 N. Y. 566, 42 N. E. 1045. We have no such situation presented here. This is not the case of a man claimed to be insane at the time of the homicide, and admitted to have been sane ever since. This is a case where it was asserted that the defendant had been continuously insane from a period of four months before the killing

up to the time of trial. The examination of the experts was directed to his mental condition at the time they saw him ; and from the conclusion they then reached, and the medical and other facts proved, they would be competent to give, on the trial, an opinion as to his sanity or insanity at the time of the homicide. The jury are entitled to the facts on which an insanity expert bases his opinion, and when those facts are the result of his own interviews with the defendant, it is not only competent, but necessary, that they should be laid before the jury. In a Massachusetts case the court says : "Juries are to judge of facts : and, although the opinions of professional gentlemen on facts submitted to them have justly great weight attached to them, yet they are not to be received as evidence, unless predicated upon facts testified either by them or by others." Dickinson v. Barber, 9 Mass. 225. These general principles are elementary. The jury are entitled to all the facts on which the expert bases his opinion. If he answers a hypothetical question, the facts therein set forth have been proved on the trial. If he rests his answers on facts and knowledge he has acquired himself, he must impart them to the jury. The following are a few of the cases bearing on the general question : People v. Wood, 126 N. Y. 249, 27 N. E. 362 ; People v. Lake, 12 N. Y. 363 ; People v. Hawkins, 109 N. Y. 408, 17 N. E. 371; People v. Taylor, 138 N. Y. 404, 34 N. E. 275 ; Insurance Co. v. Cotheal, 7 Wend. 72, 78.

A further ground of error is found in the charge delivered to the jury, wherein the court adopted the following quotation as setting forth the law of this state : "Jurors ought to be told, in all cases, that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crime, until the contrary be proved to their satisfaction, and that, to establish a defense on the ground of insanity, it must be clearly proven that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know that he was doing what was wrong." If the court had been dealing only with defendant's burden of proof in establishing insanity as an affirmative defense, it would have been error to declare it must be

clearly proven, as a preponderance of evidence meets the legal requirement; but the court was dealing with defendant's burden of proof in view of the legal presumption of sanity which relieved the district attorney from proving it as a part of his prima facie case. This portion of the charge was, therefore, calculated to mislead the jury on two very important points, viz. the amount of droof necessary to be given by defendant to place the district attorney under the burden of proving sanity as an issue tendered by the indictment, and the effect of a reasonable doubt created in the minds of the jury by the evidence as to the insanity of defendant. If the defendant offers evidence tending to prove he was insane at the time of the homicide, the regal presumption of sanity is rebutted, and the prosecution must prove sanity by a preponderance of evidence. Walker v. People, 88 N. Y. 88; O'Connoll v. People, 87 N. Y. 377. It is also the rule that, if defendant's evidence creates, in the minds of the jury, a responsible doubt as to his sanity at the time of the killing, the prosecution must remove that doubt by a preponderance of evidence. Brotherton v. People, 75 N. Y. 159 ; People v. McCann, 16 N. Y. 58. The sole defense in this case was insanity, and it was most important that the jury should have been clearly instructed as to the points we have discussed ; and general statements in the charge as to burden of proof and reasonable doubt cannot be said to cure so vital an error as the one now presented.

We have been referred to various occurrences during the trial, which the defendant's counsel insists, if not presenting legal error must satisfy the court that justice requires a new trial (Code Cr. Proc. § 528); but we think it unnecessary to consider them, as we have reached the conclusion that, for the reasons already stated, the judgment of conviction must be reversed, and a new trial ordered.

All concur.

Judgment of conviction reversed.