itself, or its successors, from passing the proper sentence, whenever such a course appears to be advisable. People ex rel. Forsyth v. Court, etc., ante.

The case above reported holds that courts of special sessions have the same inherent power to suspend sentence as courts of superior criminal jurisdiction.

The judgment may be pronounced at any time after suspension within, but not after the expiration of, the longest period for which the defendant might have been sentenced. Section 470a, Code of Crim. Pro.

# Court of Appeals.

(October 13, 1896).

## PEOPLE v. HOCH.

### 1. Homicide—Insanity.

The determination of the jury upon the question of insanity, upon the trial of an indictment for homicide, will not be interfered with, where the evidence is in fair conflict and permits of opposing inferences.

### 2. Same.

In the absence of elements from the case as show that the verdict is against the weight of evidence, or that it seems to have been influenced by some mistake, error or prejudice, it will be regarded as conclusive in the court of appeals.

### 3. Court of appeals—Power under § 528 of Criminal Code.

However great the lattitude of power conferred upon the court of appeals by the statute, in review of capital cases, to order new trials, that power is not called into exercise by the appearance of some error in the conduct of the trial which no exception pointed out, unless the substantial rights of the accused can be seen to have been affected by it, and justice demands another trial.

### 4. Same.

If the accused has had a fair trial upon his accusation and the court of appeals is satisfied that the conviction is sufficiently supported by competent evidence, such conviction must stand.

## 5. Oyer and terminer—Transfer of cases.

No order of the court is needed for the purpose of transferring a case from the court of oyer and terminer, in which the trial was commenced, to the supreme court, on the first day of January, 1896. Section 6, article 6, constitution 1894 is in this respect a self executing mandate, and it was not intended that it should be put into operation through any inferior instrumentality.

## 6. Criminal law—Jury—Separation.

Where a juror was taken ill and put in charge of a sworn officer, to enable him to consult a physician, with the consent of the defendant's counsel and remains in such charge over a day, and on the second day takes his seat and the trial is proceeded with, there is no separation of the jury constituting a misconduct under section 465 of the Criminal Code.

## 7. Same—Evidence.

Where the events of a former trial and conviction are introduced into and made a part of a hypothetical question intended to array the facts for the opinion of defendant's insanity, it is not incompetent, when it appears that the witness has then examined him as to his sanity, to elicit upon the cross examination the facts about that earlier examination.

## 8. Same—Physician.

A physician who has attended the defendant at the special employment for the people, for the purposes of their prosecution, does not occupy the relation toward the prisoner of physician and patient, so as to make the latter's communication privileged.

## 9. Same—Insanity.

Where the issue turns upon the prisoner's mental condition at the time of the homicide,—whether he was laboring under such defect of reason as to render him incapable of knowing the nature and quality of the homicidal act, or was incapable of knowing that it was wrong,—no competent evidence, bearing upon his mental condition at the time of the homicide or since should be excluded.

## 10. Same—Remarks of counsel.

Where the counsel for the prosecution has, in his closing address to the jury, improperly commented upon the failure of defendant to testify in his own behalf, and subsequently says that he was "perfectly willing that they should be stricken out," and the court not only so ruled, but, before submitting the case to the jury, charged them that it was of "no legal consequence," that "the defendant did not testify in his own defense," it was held to fully avert any prejudice to the accused from the improper allusion to the defendant's silence.

## 11. Same—Instruction.

Where, in defining the degrees of murder, the judge read section 184 of

the Penal Code and, in so doing inadvertently used the word "first" instead of "second," it was held that it could not have been of the slightest consequence, in view of his clear, express and reiterated remarks in explaining the provisions of the statute and in laying down the law by which the deliberations of the jury were to be governed.

**12. Same.**

An instruction, which is no injurious or censorious comment upon the defendant's refusal to testify, but is explanatory of his silence and a statement of his legal right to remain silent as to the charge, which the people were bound to establish to be true beyond a reasonable doubt, is not prejudicial to him, and, therefore, no ground for reversal of conviction.

Appeal from a judgment, convicting defendant of murder in the first degree.

William H. Hilts, for appellant.

F. Franklin Jacox, for the People.

GRAY, J.—The defendant was charged in the indictment with the crime of murder in the first degree for having with intention and deliberate design killed Minnie Ingersoll by shooting her with a rifle. Being arraigned, he interposed a plea of "not guilty, and insanity," and, being tried upon the charge, the jury rendered a verdict of murder in the first degree. Upon this appeal from the judgment of conviction it is argued in behalf of the defendant that the evidence does not justify the verdict rendered, and that errors were committed upon the trial, which require a reversal of the judgment and the ordering of a new trial.

The foundation of the case for the people against the defendant rests in his confession, testified to by his sister and her husband as having been made to them. This was within an hour or two of the homicide; and the evidence of other witnesses concerning the defendant's acts upon that day is so corroborative of material facts detailed in the narrative of the defendant's confession as to evidence its truthfulness. The manner of the killing of the deceased was shown by the evidence of an elderly man, named Nicholas Strife, who was with her at the time. They were engaged in milking, upon what was known as the "Strife Farm," in the evening of July 10, 1895, and, as they were passing, with

their pails full of milk, over the barn floor, and towards a passage-
way leading therefrom and between a box stall and the side of
the barn, two shots were fired in quick succession from a window
in the stall, the first of which struck deceased, and the second of
which struck the witness Strife, and wounded him in the side.
Upon being struck, the deceased fell instantly to the ground, and,
beyond exclaiming "Oh. dear me; oh, dear me!" never uttered
another word; and the subsequent examination by the physician,
who extracted the bullet from her spinal column, showed that its
course was such as to have been necessarily, and almost instantly,
fatal.

Minnie Ingersoll, the deceased, was an unmarried girl, about
seventeen years old, who resided with her brother, then managing
the Strife farm.    The defendant was a single man of about thirty-
five years of age, and had been paying his attentions to Minnie,
contrary to the wishes of her family.    The shooting occurred at
about half-past seven in the evening, and later, between half-past
eight and nine o'clock, the defendant appeared at the house of
Charles Graves, his sister's husband, about three and one-half
miles from the Strife farm, and gave to Mr. and Mrs. Graves his
watch, pocketbook, and sundry other personal effects, with the
remark he did not want them any more.    He also went out, and
brought into the house a Winchester rifle, and gave it and a
handful of cartridges to Mr. Graves, keeping with him a loaded
revolver.    Upon being pressed by Mrs. Graves to tell what he
had been doing, he said he had shot Minnie Ingersoll and an old
man.    He described how he had waited about the farm buildings
until the departure of some persons whom he saw there, and then
how that he got into the barn, and, when he saw the deceased
coming towards him with a pail of milk, had shot her.    The tes-
timony was that he said, "I calculated to shoot her twice, and I
hit Mr. Strife," or somebody whom he did not then know, and
that he said "he did not calculate to shoot him; he wanted to
make sure work of her, and so he shot twice."    Upon being asked
why he shot her, the defendant said, "If he couldn't marry her,
there shouldn't any one else have her."    The confession of the
defendant that he killed the deceased is testified to by Charles
Graves and his wife, who also gave in evidence statements made

to them by the defendant as to what he had done during the day, and just as it was proved through other witnesses. He told of purchase of a Winchester rifle in the morning, and that he had hired a vehicle, and had taken and hidden the gun in the bushes. After returning the team, he went back on foot in the afternoon to some woods near the Strife barn, where he satisfied himself as to his marksmanship by practicing at a mark, before undertaking to shoot at the deceased. A man, working in the neighborhood heard two quick gunshots in the direction of the Strife buildings about 7.30 o'clock in the evening, and, going over at once, he saw the deceased lying inanimate and bleeding upon the barn floor. Another witness heard several shots in the piece of woods between his and the Strife farm, at about seven o'clock, and some minutes later he noticed two rapid shots in the same direction. Defendant had told the Graveses about trying to cross the gulf—a wooded ravine south of the Strife farm, called "Roaring Brook Gulf"—on his way to their house. The man Strife, who was wounded by the second shot in the barn, saw a man running from the barn, carrying a gun, towards the gulf, in the rear or southward of the farm. The next morning the witness found in the box stall in the barn an empty cartridge of the description of those required by the defendant's rifle. The defendant slept at Graves' house the night of the killing, after being assured that he would be notified if any one came. He told the Graveses that he wanted to know of any one coming, saying, "They won't take me away from here alive." The next morning, when the deputy sheriff arrived, the defendant, coming out of the house, shot himself in the forehead with his revolver, and was taken away in a vehicle, in a wounded condition. Without further adverting to the evidence, it is sufficient to say that the defendant's confession to his sister and her husband was shown to be true in its statement of facts, and it is clear that he had intended and planned to kill the deceased; that he chose a favorable opportunity for accomplishing the deed effectually, and was conscious enough of the crime he had committed to run away through the woods to his sister's house, and, when threatened with arrest, to seek to put an end to his own life. The deed was not only deliberately committed, but the evidence showed it to have been premeditated from motives of revenge and

jealousy, excited by finding his attentions rejected by the deceased, and opposed by her family. Five days before the homicide the defendant was overheard, while saying to the deceased, as he was driving away from the Strife farm house after a call, "Minnie, it won't do me any good to come again, will it?" and when she replied, "No," he continued, "Minnie, you will be sorry for this, and if you are not sorry somebody else will be." The father of the deceased had driven with the defendant upon the day he had called, and, replying to the inquiry as to what objection he had to his "keeping company with his daughter," had said, "she was too young," and that he "didn't think she wanted to keep his company any more than he [her father] wanted to have it." About noon of the day of the shooting the defendant drove up to where the brother of the deceased was, to inquire if she was at home, and was told he could not go with her as long as she was staying there; that "our folks were against it." The case is one of a man of mature years pressing his attentions upon a very young girl, and, finding them opposed by the family, and rejected by the girl, deliberately taking her life; with a very careful regard for the secrecy of his deed and of the preparations for it. There is no doubt, upon the evidence, that he was guilty of having designedly shot and killed the deceased.

The defendant did not testify in his own behalf, and the evidence in his defense consisted mainly in the attempt to prove that he was irresponsible, because of insane mind. The evidence in that respect is not, in our opinion, entitled to much weight, and that the jury did not believe the defendant to have been insane is not surprising. Members of his family testified to acts and occurrences which either seem very trivial, or were quite compatible with a morose and willful character, combined with stupidity, or a low degree of intelligence. The father described what he thought to be a fit, when his son was twelve years of age, and incidents during boyhood of a seemingly trivial nature, showing, possibly, weak health, and a dull temperament. A brother told of defendant's falling from a horse while a boy, and striking his head upon a stone, which, however, did not cause any serious injury at the time, or necessitate a doctor's services. He also related an instance, within a year, of seeing defendant abusing himself.

These and other members of the family also related instances of abrupt conduct in intercourse with them, and in the manner of leave taking, and of alternative habits of taciturnity and of talkativeness. Each testified to being impressed with the irrationality of defendant's acts and appearance, and what caused such impression is stated in the evidence. There was testimony by an uncle that defendant's father had drunk to intoxication before and after marriage, and, during his wife's pregnancy with defendant, had kicked her. There was very trivial, if not frivolous, evidence by others concerning defendant's conduct at various times, and the record of a former trial for assault in the first degree, in 1887, was introduced, which showed that the plea of insanity had been then interposed. He had been engaged to be married, had refused to perform his engagement, and, after a dispute with the mother of the girl, who objected to his then going with her, he shot at and wounded her. The jury found him guilty in that case, and he served a term of imprisonment.

Upon the trial, medical experts were examined on either side, and gave their answers to hypothetical questions as prepared and propounded. The usual conflict of opinion occurred, which is constantly seen upon such trials, and which tends not only to bring discredit upon a learned profession, but, more seriously, to embarrass the search after the truth, in which the tribunal is engaged, by confusing and darkening the minds of the jurors with opinions upon the scientific questions before them, which are expressed as previously pledged to either side. The fact that the rule which permits expert testimony in such cases works, in practice, badly for the interests of justice, cannot be so much attributable to the inexactness of the science in which the witness is assumed to be skilled as to the pre-enlistment of his opinion by the party. That the procedure in such respects is defective is also true. However, the issue of sanity was submitted to the jury, who were to finally determine it upon the evidence, and whose determination will not be interfered with where the evidence was in fair conflict, and permitted of opposing inferences. In the absence of such elements from the case as show that the verdict was against the weight of evidence, or that it seemed to have been influenced by some mistake, error, or prejudice, it will be regarded

as conclusive here. People v. Schuyler, 106 N. Y. 298; 12 N. E. 783; People v. Loppy, 128 N. Y. 629; 28 N. E. 600; People v. Taylor, 138 N. Y. 398; 34 N. E. 275. In our opinion, not only were these elements absent, but it is difficult to see how any other inference could be drawn from the evidence than that the defendant was at all times perfectly sane and responsible for his acts, however vengeful, sullen, and peculiar may have been his conduct and habits. I may add, in passing, that in the hypothetical questions framed and put to defendant's medical experts several assumptions of facts of a more or less serious nature were not justified by the evidence in the case.

Errors are alleged in the brief to have affected the fairness of defendant's trial, and they were pressed upon us during the argument. Some are quite unimportant; others are technical, but are not raised by any objection and exception; while others, again, which seemed grave when started in the argument of counsel, upon an examination of the record appear in quite a different light. The defendant's counsel has been somewhat more ingenious than ingenuous in the presentation of his client's case. To instance the alleged errors in the impaneling of a jury: One concerned a question to Rowsam, examined as to his qualifications as a juror, where the court confined its scope as requested by the district attorney. Not only was no exception taken, but, later on in the proceedings, and after the jury box was filled, by arrangement between the counsel, the juror Rowsam was excused. So in the case of one Adams, where the court excused him after he had stated his age to be sixty-five, there was no objection or exception, whatever it may have been worth. Finally, in the case of Lanpher, who, after being examined as to his recollection of reading about the homicide, or the evidence taken before the coroner, was challenged by defendant for bias, there not only was no ruling by the court, nor any exception, but, at the end of his examination, the defendant expressly accepted him as a juror. It is clear that if there was any error it was not made available by any exception, and it should be distinctly understood that, however great the latitude of power conferred upon this court by the statute, in the revival of capital cases, to order new trials, that power is not called into exercise by the appearance of some error in the conduct of

the trial which no exception pointed out, unless the substantial rights of the accused can be seen to have been affected by it, and therefore justice demands another trial. Code Cr. Proc. §§ 528, 542. Section 528 permits of a new trial in capital cases if this court is "satisfied that the verdict is against the weight of evidence, or against law, or that justice requires a new trial, whether any exception shall have been taken or not"; and section 542 requires us to "give judgment, without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the accused." The spirit of this legislation, as is its letter, is that, if the accused has had a fair trial upon his accusation, and if this court is satisfied that the conviction is sufficiently supported by competent evidence, that conviction shall stand. We are not justified by those provisions of the Code, any more than by a true sense of justice, in reversing a conviction if the rights of the accused have not been violated, and the verdict against him was not reached by error, or by ways of passion or prejudice.

There are a number of other errors alleged to have been committed, which are not pointed out by exceptions, and they will not be noticed, both for that reason and because, if they might be regarded as errors, they are utterly trivial, and could not affect the result. It is contended that because no order was made transferring the case from the court of oyer and terminer, in which the trial had been commenced, to the supreme court, on the first day of January, 1896, the date of the operation of the constitutional provision abolishing circuit courts and courts of oyer and terminer (section 6, art 6, Const. 1894), the proceedings thereafter were without jurisdiction. Overlooking the absence of any objection to raise the question, it is sufficient to say that the constitutional provision expressly provided that the jurisdiction of those courts "shall thereupon be vested in the supreme court." What the people declared in that section of the revised constitution needs no order of the court to carry into effect. The highest authority in the state had decreed the abolition of certain courts, and the transfer of pending actions to the supreme court. No law, nor any order, could have added to the effective operation of the section upon the date fixed by its language. In that respect the constitutional provision was a self-executing mandate, and it was not

intended that it should be put into operation through any inferior instrumentality.

It is urged that there was a fatal irregularity on the part of the jurors in their separation pending the trial. A juror being taken ill, the trial judge said he would put him in charge of a sworn officer, to enable him to consult a physician. Defendant's counsel said there was no objection. Such juror remained in charge of a sworn constable over a day, the physician reporting him as too ill to come out. On the second day after, he took his seat, and the trial was proceeded with. No objection was made, and there was, in fact, no separation of the jury constituting the misconduct contemplated by section 465 of the Code of Criminal Procedure. There is nothing to show that the sick juror was ever out of the charge of the officers, or that any communication was had with any person not connected with the trial. There was nothing in the incident which could have prejudiced the defendant.

Objection was taken to a question upon the cross-examination of Dr. Crosby, who had been examined as an expert in behalf of the defendant. In the hypothetical question propounded to him by defendant it was stated that in 1887 he had shot and wounded the mother of a girl to whom he was engaged to be married; that he had been convicted and sent to prison; and that while serving his sentence he was regarded as peculiar and irrational, and was frequently found weeping without cause, and a keeper had "reported him insane"; and other facts concerning his conduct as a prisoner were stated. The witness answered that he might have been insane on the day of the tragedy. On cross-examination it appeared that the witness had examined the defendant for the people, while in jail, awaiting trial upon the previous charge, and he was asked to give his judgment, from his "examination under his employment by the district attorney," as to whether defendant was then sane or insane. Objection was made and placed upon the two grounds that the relation of physician and patient existed, and that it was not "such cross-examination as is allowed of an expert." The court overruled the objection, and the defendant excepted. As the events of the former trial and conviction were introduced into and made a part of the hypothetical question intended to array the facts for the opinion of defendant's insanity, it

was not incompetent, when it appeared that the witness had then examined him as to his sanity, to elicit upon his cross-examination the facts about that earlier examination. It was a competent way to probe the witness' mind, and to test the merits and value of the opinion he had expressed of defendant's insanity on the assumed state of facts. But, aside from that consideration, it appeared that the witness' examination had not been made, as claimed in the objection, while attending the defendant as his physician, but it had been at the especial employment of the people, for the purposes of their prosecution. He was not disclosing any information acquired in attending a patient in a professional capacity.

Dr. Sawyer was the physician in charge of Auburn Prison, and his duties had familiarized him with cases of insanity. The district attorney showed that the witness had made an examination of the defendant, for the purpose of ascertaining his mental condition, just before and during the trial. He had observed him from day to day, and he stated just what he had done in examining him. He was asked whether, in his opinion, the defendant was sane or insane, and the objection to the question was overruled. The criticism of the defendant's counsel is that the inquiry should be as to his condition on the day of the homicide, and not at the time of the trial. Of course, the issue turns upon the prisoner's mental condition at the time of the homicide,—whether he was laboring under such a defect of reason as to render him incapable of knowing the nature and quality of the homicidal act, or was incapable of knowing that it was wrong. But there is no apparent reason, and I am aware of no authority, for holding that, in addition to all the other facts, the jury may not be informed, by one competent to speak, as to the mental condition of the defendant at the time of his trial. He stands before them accused of the crime, with a plea of insanity to shelter him from a conviction at their hands, and in their consideration of his plea for exoneration no competent evidence bearing upon his mental condition at the time of the homicide or since should be excluded; and the evidence objected to certainly cannot be said to be prejudicial to any substantial rights of the accused, or to contravene the demands of justice. There seems to be no force in this objection whatever. Nor is the further criticism of counsel of importance to consider,

—that no facts or conversations were given to the jury by the witness. The witness stated what occurred upon his examinations. No point was made by the defendant that they were insufficient, and nothing relating to the examination was excluded, as was the case with the conversations in People v. Nino, 149 N. Y. 317, 326; 43 N. E. 853.

When the counsel for the prosecution was closing his address to the jury, he used these words: "The little mound under the snow alone knows, and the defendant will not speak." Defendant requested that the "court ask the jury to eliminate from their minds those words, or else that they be made a part of the record." The counsel for the prosecution said he was "perfectly willing that they should be stricken out." The court not only so ruled, but, before submitting the case to the jury, charged them that it was of "no legal consequence" that "the defendant did not testify in his own defense. In our country the defendant is not compellable to testify against himself on a criminal charge, * * * and our statute further provides that the fact that a person accused of crime declines to take the stand and testify in his own behalf shall not be considered against him." Any prejudice to the accused from the improper allusion to the defendant's silence was fully averted, not only by the action had in the presence of the jury in striking it out, but in the pointed remarks of the trial judge in submitting the issue to the jury.

No exception was taken by the defendant to the charge, and, after carefully reading and considering its language and terms, the conclusion must be reached that the jury could not have been led into error, or into any confusion of mind, by any observation of the trial judge. The defendant's counsel, however, now, upon this appeal, indulges in various criticisms of the charge, some of which we shall answer, as briefly as possible. The trial judge is reported in the record, in defining the degrees of murder, to have read section 184 of the Penal Code, as follows: "Such killing of a human being is murder in the first degree, when committed with the design to effect the death of the person killed, but without deliberation or premeditation." The error would be in the use of the word "first," instead of second," in speaking of the degree. That he is correctly reported in simply incredible, and the affida-

vit of the court stenographer, since submitted upon a motion to have us correct the record, is to the effect that his notes of the testimony were incorrectly printed.    As the prisoner's counsel does not assent to the correction, and as we have no power to change the record, we may assume that the judge may inadvertently have read "first" for "second" in the statute, and still we cannot say the error could have been prejudicial.    That the judge had no such incorrect idea in mind is clear from what followed. He very fully said, and repeated, to the jury that the distinction between the degrees of murder was the existence of deliberation and premeditation in the commission of the offense.    At some length he calls the attention of the jury to this distinguishing feature in the nature of crime under the statute, and sums up in this wise : "In order to be of the highest degree, the design must be deliberate and premeditated ; but, in the second degree, the design to kill must have been formed suddenly, without premeditation or deliberation, and immediately carried into execution."    Then he proceeds to define what is premeditation and deliberation, which he accomplishes by reading from decisions of this court; and again, after doing so, repeats to the jury the distinction in the two degrees of murder in clear and unmistakable words.    So, if we can assume that his reading of the section has been correctly reported, it could not have been of the slightest consequence, in view of the clear, express, and reiterated remarks of the trial judge in explaining the provisions of the statute, and in laying down the law by which the deliberations of the jury were to be governed.

Further criticism is made that the trial judge used language which indicated in his mind the belief that the defendant killed the deceased.    This arises from misconception and partial reading. He had discussed the phase of the case upon the facts which the people claimed proved the defendant's guilt, and, having done so, said : "We are now brought to the question, is the defendant excusable for killing the deceased, and protected by statute from all criminal punishment therefor?" and he read section 21 of the Penal Code, which excuses an idiot, imbecile, lunatic, or insane person under specified conditions.    There was no expression of opinion upon the fact of the defendant's guilt, and the charge, up-

on the assumption of the defendant's being the perpetrator of the deed, was proceeding to state the law and to review the evidence on the subject of insanity. This review was very guarded in its statements, and very fair to the accused. The jury were instructed that, because of the evidence introduced by the defendant, "the burden of proof was upon the people to show that his mind was at least sound enough so that he knew the nature and quality of the act which he was doing, and that he knew the act was wrong, when he shot the deceased." If they had any "doubt but that the evidence, when critically viewed and weighed, proves these propositions," the judge remarked, "the defendant is entitled to the benefit of that-doubt, and a verdict of acquittal." The question of insanity, as an excuse for crime, is treated at great length, in the light of many decisions, and with considerable clearness of reasoning.

Finally, the criticism is made that prejudice accrued to the accused from certain other language of the trial judge. He had remarked that "The defendant has not given evidence on this trial himself; therefore the evidence of his former conviction cannot be regarded on any point except as you may deem it applicable on the insanity theory. It cannot be regarded as evidence of his commission of the crime at issue here." Having said this, and forbidding any inferences as to guilt from the commission of a former crime (the evidence as to which, it will be remembered, was introduced by the defendant himself), he proceeded thus: "I said the defendant did not testify in his own defense. Why did he not? That is of no legal consequence. In our country the defendant is not compellable to testify against himself on a criminal charge," and continued in words as previously given in this opinion. This was no injurious nor censorious comment upon the defendant's refusal to testify. It was explanatory of his silence, and a statement of his legal right to remain silent as to the charge, which the people were bound to establish to be true beyond a reasonable doubt. This was rather advantagenus than prejudicial to the defendant. The charge, on the whole, was eminently fair to the accused, and the portions now criticised would not have been the subject of any valid exception had the defendant's counsel been so minded at the time.

Upon a very deliberate review of the record of this trial, and mindful of the interest at stake, our judgment must be that it was fair and impartial, and without the element of any prejudicial error. The evidence warranted the conclusion that the defendant's confession of guilt was true, that he was actuated by a vengeful or mortified spirit, and that he studiously planned the mode and the time of the killing so as to prevent discovery. The evidence fell far short of proving an insane mind at the time of the homicide, or, indeed, at any time, and tended to show that defendant was quite conscious of the nature and quality of his act, and that he had done wrong. The judgment of conviction should be affirmed.

VANN, J. (dissenting).—Upon the trial of this action evidence was given tending to show that on the 10th day of July, 1895, at the town of Martinsburgh, county of Lewis, the defendant shot and killed one Minnie Ingersoll, under circumstances warranting the conclusion that he was guilty of murder in the first degree. The main evidence for the defense related to the plea of insanity, which was interposed as a specification under the plea of not guilty, as authorized by section 336 of the Code of Criminal Procedure. The record discloses that when the counsel for the people had finished summing up, the counsel for the defendant, addressing the court, said: "If your honor please, the counsel, in his address to the jury, made use of these words: 'The little mound under the snow alone knows, and the defendant will not speak.' I ask that those words,—that the court ask the jury to eliminate from their minds those words, or else that they be made a part of the record." The people's counsel thereupon said, "I am perfectly willing that they should be stricken out," and the trial judge then remarked, "If you are willing, they may be stricken out." Nothing further was said upon the subject until the court, in its charge to the jury, made use of the following language: "The fact that the defendant, several years ago, shot another woman, and was convicted of the crime of assult in the first degree, and served a term in state's prison therefor, has been introduced as one factor in evidence of his insanity. The defendant has not given evidence on this trial himself. Therefore the evi-

dence of his former conviction cannot be regarded on any point except as you may deem it applicable on the insanity theory. It cannot be regarded as evidence of his commission of the crime at issue here. It cannot be inferred that he is guilty of this crime from the fact that he was adjudged guilty of that crime. As I said, the defendant did not testify in his own defense. Why did he not? That is of no legal consequence. In our country the defendant is not compellable to testify against himself on a criminal charge. That is one of the guaranties of our constitution respecting the liberty of the citizen, and our statute further provides that the fact that a person accused of crime declines to take the stand and testify in his own behalf shall not be considered against him." Nothing appears to have been said or done by court or counsel at any time in relation to the failure of the defendant to be sworn, except as thus stated. Both the state and national constitutions provide that " no person shall be compelled, in any criminal case, to be a witness against himself." Const. U. S. Amend. 5; Const. N. Y. art. 1, § 6. It is a part of the bill of rights, and is repeated in section 10 of the Code of Criminal Procedure, although by a subsequent section it is provided that " the defendant in all cases may testify as a witness in his own behalf, but his neglect or refusal to testify does not create any presumption against him." Code Cr. Proc. § 393. Prior to 1869, a defendant could not be sworn, even in his own behalf, upon the trial of an indictment against him, but in that year an act was passed making him a competent witness, " at his own request," but with the same provision in relation to the effect of his neglect or refusal to be sworn as is quoted above from the Criminal Code. Laws 1869, c. 678. The object of this statute was to benefit the accused by repealing the rule of the common law which kept him from the witness stand. It was not designed to add to his burden or embarrassment, but its sole purpose was to enable him to make a better defense by taking the stand as a witness, provided he chose to do so. It sought to protect him from all harm if he was not sworn by declaring that no presumption should arise against him from that fact. As was said by this court in People v. Tice, 131 N. Y. 651, 656; 30 N. E. 495, "The law, so far as it can, protects a defendant who omits to be sworn from having that fact

weigh against him." It was at one time contended that the sup-
posed moral coercion exerted upon a person accused of crime to
compel him to offer himself as a witness by reason of the adverse
inference which might be drawn from his omission to testify, when
presumably all the facts were known to him, rendered the act un-
constitutional; but this court held otherwise, partly for the reason
that the statute expressly forbade any adverse presumption from
the silence of the defendant. People, v. Courtney, 94 N. Y. 490;
Ruloff v. People, 45 N. Y 213, 222. It is idle for the statute to
forbid unless practical effect is given to the prohibition by the
courts. What is the command of the statute worth if the pre-
sumption that it forbids is suggested to the jury by the court, and
they are not expressly told to ignore it? If the presumption
springs up in their minds, and is allowed to remain there, the
statute is violated, and the defendant is deprived of a substantial
right. As they were not told to disregard the question asked by
the court, what assurance is there that they did not answer it to
the prejudice of the defendant? Is it not reasonable to suppose
that they tried to find an answer to such a question, coming from
such a source?

In the Ruloff Case, supra, this court, said: "Neither the prose-
cuting officer nor the judge has the right to allude to the fact that
a person has not availed himself of this statute; and it would be
the duty of the court promptly to interrupt a prosecuting counsel
who should so far forget himself and the duties of his office, as to
attempt to make use of the fact in any way to the prejudice of a
person on trial. An allusion by the judge to the fact, unex-
plained, cannot but be prejudicial to a person on trial, and a pro-
vision intended for his benefit will prove a trap and a snare." It
was held in that case that the allusion by the trial judge to the
fact that the accused was not sworn was sufficiently explained in
a subsequent part of the charge. In People v. Rose, 52 Hun, 32,
39; 4 N. Y. Supp. 790, the trial court, upon the request of the
defendant's counsel, struck out certain remarks of the district at-
torney, including this question asked by him in his address to the
jury on a criminal trial, viz.: "Why has not the defendant been
sworn?" The court, however, although duly requested, did not
tell the jury that they could draw no inference against the prisoner

because he had not been sworn. There was no express refusal, but the judge remarked, " I do not think the district attorney will go on any further." The general term, in reversing the judgment of conviction, said : " It was the duty of the court, by proper instruction to the jury, to protect the defendant against the prejudice or inference which the district attorney's remarks suggested ; certainly upon proper request. The matter was of the utmost importance to the defendant, and the request of his counsel should have been explicitly granted. As it was, the comments of the district attorney and the request of his counsel were disposed of in a manner well calculated to impress the jury with the idea that the district attorney was only technically wrong, but substantially right, and that the request of defendant's counsel was of small moment." It is obvious that an inadvertent allusion, if explained with sufficient care and clearness so that it is plain to be seen that no harm could have been done, should not be permitted to disturb a judgment ; but if, on the other hand, the statute has, either directly or indirectly, intentionally, or otherwise, been, in effect, used against the defendant, the judgment should not be allowed to stand. The question in all such cases, as it seems to me, is whether the statement, as made, when considered in connection with the explanation, if any, can fairly be presumed to have been without harm to the defendant.

The statement made by the counsel for the prosecution in his address to the jury tended to call their attention in a pointed and suggestive manner to the fact that the defendant had not been sworn. It violated the spirit of the statute, passed for the protection of the accused, by seeking to draw an inference of guilt from his omission to testify. It was the duty of the court to comply with the request made, and instruct the jury "to eliminate from their minds" the objectionable words. It did not do so, but struck out the words in such a way as to convey the impression that it was not done as a matter of justice to the defendant ; but because the prosecuting counsel consented. The form of the court's order was contingent, and implied that, unless the prosecution had consented, the direction to strike out would not have been made. The jury were not instructed to disregard the words, or told that the omission of the defendant to be sworn could not be used against

him in any way. They may well have thought that the words were stricken out through the generosity of the district attorney, and not because the law required it. To merely strike from the record, under such circumstances, might leave the jury ignorant of their duty in reference to the subject, especially since the request for instructions to eliminate the words from their minds was disregarded. There should have been an explicit and emphatic direction given to the jury that it was their duty to pay no attention to the improper suggestion of counsel, and that the failure of the defendant to be sworn was not a subject for their consideration. When the statement made by counsel was followed by the question, put to the jury by the court in its charge, why the accused did not testify in his own defense, the impression naturally made upon their minds would not ordinarily be removed by merely perfunctory remarks, even if they were a correct exposition of the law. The power and influence of the supreme court went with the question. It was in the nature of an argument against the defendant from that high source. It called for an explanation that could not then be given, and which, by the law's command, can never be required. If it had been asked by counsel, it would have been the duty of the court to promptly rebuke him, and to tell the jury that it was an improper question for counsel to ask or for them to answer. That the question was inadvertantly put by the learned judge is obvious from the prompt explanation that followed, yet, in explaining, the court said that the omission of the defendant to be sworn was of no legal consequence, and that he could not be compelled to testify against himself. Was it of any moral consequence? If he had testified, would his evidence have told against himself? Was that the reason why he did not take the stand ? Conscious of guilt, did he dare to be sworn? It seems to me that these questions would naturally be suggested to the minds of the jury by the very explanation of the court itself. It is true that there immediately followed an allusion to the safeguard of the statute, but the poison was already in the minds of the jury, and something more was required, under the peculiar circumstances, than a partial repetition of the language of the statute. The court should have told them, in substance, that, unless they wholly cast from their minds the

question that he had hastily asked, they would violate the law, and do an injustice to the defendant. In other words, the occasion required the clearest withdrawal of the words used, and an emphatic instruction to .treat them as if they had never been uttered. This was not done, and, although the humane judge who presided at the trial at once sought to correct his mistake, I think his effort was not sufficient to remove the erroneous impression that he had created in the minds of the jury, and that it is our duty to correct the error, although no exception was taken by the . defendant's counsel. People v. Corey, 148 N. Y. 476, 493; 42 N. E. 1066; People v. Driscoll, 107 N. Y. 414; 14 N. E. 305; Code Cr. Proc. § 528. The object of the statute was to protect persons accused of crime. It is difficult, even when every precaution is taken, to make it the means of safety instead of danger. Jurors will ask themselves questions that neither court nor counsel can ask with propriety. Every lawyer of experience in criminal trials knows that an innocent man, who has a bad reputation, . or who has been at some time convicted of another offense, can neither take the stand nor keep away from it without serious peril. If even silence is dangerous, what is to be said when counsel, and the learned court itself, make pointed allusions, or ask suggestive questions ? I think it is the duty of the courts to see that the humane object of the statute is not defeated, and to prevent it from becoming a pitfall instead of a protection, by requiring those who administer the law to abstain from allusions, comments, or questions, in the presence of the jury that may tend to prejudice the defendant because he was not sworn ; and, if a mistake is committed in the hurry of extemporaneous remarks, unless it is carefully and thoroughly corrected by the trial court, that it should be corrected by the appellate courts through a reversal of the judgment of conviction. Without considering any other question, I vote for reversal and a new trial.

O'BRIEN, HAIGHT, and MARTIN, JJ., concur with GRAY, J., for affirmance. BARTLETT, J., concurs with VANN, J., for reversal.

Judgment affirmed.

### ·NOTE ON "SEPARATION OF JURY."

Verdict will be set aside, where the sheriff permits the jurors to separate. State v. Foster, 14 So, 180 ; 45 La. Am. 1176.

Court may permit jurors to attend their respective places of business during a criminal trial.  Baker v. State (Wis.), 59 N. W. 570.

Where the nature of the offense charged was likely to create prejudice against the defendant in the community from which the jury were drawn, it is an abuse of discretion, after their empaneling and the commencement of the trial, to discharge the jury for sixty-three days, on motion of the state, because one of its witnesses was unable to attend. People v. Dinsmore (Cal.), 36 P. 661.

Where the jury, during the trial, slept, six in each, in two adjoining, but not communicating, rooms, and the officers in charge in an adjoining room which communicated with one of the jury rooms, whose doors were locked by the officers, such separation did not, in the absence of any tampering or inter-ference with the jury, vitiate the verdict.  Commonwealth v. Manfredi, 29 A. 404 ; 162 Pa. St. 144 ; 34 W. N. C. 437.

Slight separation and passing near other persons by the jury in leaving and returning to the court house, do not constitute ground for reversal, where they were kept practically together and the officers did not speak to them nor suffer them to be spoken to, as to any matter relating to the trial.  State v. Belknap (W. Va.), 19 S. E. 507.

Permitting one of the jurors to become separated a short distance from the other jurors, is not reversible error, where he was in sight of the officer, and no one had an opportunity to converse with him.  Holly v. Commonwealth (Ky.), 36 S. W. 532.

Misconduct of a juror, when passing a store with other jurors during a trial, in leaving them, going into the store alone, calling for a paper and pen and writing a note, if not explained, is ground for a new trial. Cartwright v. State (Miss.), 14 So. 526.

Permission, by the bailiff in charge of the jury, to separate during a recess of the court, in violation of section 1842, R. S. 1881, is not ground for revers-ing a conviction.  Masterton v. State (Ind. Sup.), 43 N. E. 138.

Permission to two jurors, by the bailiff, during a recess of the court, to visit the water closet, is not a separation of the jury within the meaning of section 1842, R. S. 1881, where the bailiff accompanies them to the door of the room adjacent to the closet.  Masterton v. State (Ind. Sup.), 43 N. E. 138.

It is not ground for a new trial that a juror, in the middle of the night, when no outsiders were around, left the room where the other jurors were sleeping, and went to the water closet, the deputy sheriff going into the hall with him, and seeing that no one was in the hall or closet and the juror mak-ing affidavit that he neither saw nor spoke to any one while absent.  State v. Harrison (W. Va.), 15 S. E. 982 ; 36 W. Va. 729.

Under section 1311, Wash. Code Proc., allowing a jury to separate, though only for a few minutes, and mix with the crowd in the court room, where the testimony is such as to produce disgust and indignation against the defendant, is reversible error, though the prisoner and his counsel, who were both present,

made no objection at the time. State v. Place (Wash.), 32 P. 736 ; 5 Wash. St. 773.

Fact that a sick juror had been separated from his fellow jurors during a recess of the court, will not, where he has not been tampered with, sustain a motion to discharge the jury. Stout v. State, 25 A. 299 ; 76 Md. 317.

Under section 198, Hill's Code (Or.), it is discretionary with the court to keep the jury together, or permit them to separate, before the submission of the cause to them. State v. Shaffer (Or.), 32 P. 545.

State may show that the jury, if separated before the case has been finally submitted to them, were not subjected to improper influences during such separation. State v. Howland (Mo. Sup.), 24 S. W. 1016.

But a separation after they have retired for deliberation, without leave of the court, requires the granting of a new trial. Section 4269, R. S. 1889 ; State v. Howland (Mo. Sup.), 24 S. W. 1016.

With the consent of both parties, the jury, in a criminal case may, at any time before they finally retire in charge of the sheriff to consider their verdict, be permitted to separate. State v. Frier, 24 S. W. 220 ; 118 Mo. 648.

Separation of the jury, after retiring to consider their verdict, is, if no injury results, no cause for a new trial, in a trial for a misdemeanor. State v. Dugan (Kan.), 34 P. 409 ; 52 Kan. 23.

Separation of jury for necessary purposes only, furnishes no ground for granting a new trial, when defendant is not prejudiced thereby. Roper v. Territory (N. M.), 33 P. 1014.

Under section 4442, Iowa Code, the fact that the jury were not kept together after the cause had been submitted for deliberation, is not ground for a new trial, if defendant is not injured thereby. State v. Wright (Iowa), 68 N. W. 564.

Permitting a juror, after final submission of a murder case, to separate from the others and go, under the charge of an officer' to his place of business, in order to close the house, and also to his club, is ground for reversal of a conviction. French v. Commonwealth (Ky.), 37 S. W 269.

Under section 1909, Mo. R. S. 1879, separation, during a trial for murder in the first degree, before the retirement of the jury, will not, where the State shows affirmatively that the jurors were not subject to improper influences, constitute a ground for a new trial. State v. Avery (Mo. Sup.), 21 S. W. 193.

Fact that, on a murder trial, a juror, with the consent of the court and defendant's counsel went home for an hour, accompanied by, and remaining in sight of, a deputy marshal, and subject to no improper influence during his absence, constitutes no ground for a new trial. State v. Sanson (Mo. Sup.), 22 S. W. 617.

Allowing a jury, in a trial for a felony, not capital, to separate during the adjournments of the court, before the case is submitted to them is not error, even though the defendant, without giving any reason therefor, requests the court to have the jury kept together. Sutton v. People (Ill. Sup.), 34 N. E. 420.

Under section 4434, Iowa Code, it is error to permit a jury, before the final submission of the cause to them, to separate against the objection of defendant. State v. Garrity (Iowa), 64 N. W. 92.

Separation, though by order of court, with consent of the defedant, in as violation of the requirement of section 1128 Cal. Penal Code. People v. Hawley (Cal.), 43 P, 404.

Separation of the jury, had on the motion and with the consent of the defendant, is no cause for the granting of a motion to discharge him. People v. Hawley (Cal.), 34 P. 404.

Burden is upon defendant, in trial of felonies other than capital cases, to show that he was injured by the separation of the jury before verdict. Tervin v. State (Fla.), 20 So. 551.

Separation of several jurors from their fellows during the progress of a murder trial, so as to be out of sight of the officer who had them in charge, contrary to the order of the court, is not sufficient ground for a new trial, when it does not appear that anything was said to either of them concerning the case, or that they were guilty of any misconduct, or did any act inconsistent with their duties as jurors during separation. People v. Bemmerly (Cal.), 33 P. 263.

Fact that a juror, while deliberating on the verdict, left the custody of the officer, went upstairs to a friend's room, took a drink of whiskey, and stated, on being asked, that the jury had not agreed on a verdict, is not, in the absence of proof of prejudice, sufficient cause for reversing a conviction of assault, with intent to murder. Stewart v. State (Tex. App.), 19 S. W. 908.

Under art. 687, Tex. Code Crim. Proc., separation of a juror from his fellows without consent, by going to a fire 200 yards distant, to look after the safety of his horse, where he was absent about an hour and mingled with people on the street, is a sufficient ground for reversing a conviction, notwithstanding affidavits by all the jurors that their verdict was not affected by the separation. Robinson v. State (Tex. App.), 17 S. W. 1082.

The fact that the jury in a criminal case were given a recess and separated for five minutes after the case was submitted to them, and before they retired to the jury-room, and that one of the jurors, on account of lameness, was left in the jury room with the door locked while the others, under the charge of the bailiff, were at their meals, is no ground for a reversal, where it appears they talked with no one, and heard no remarks concerning the case. Territory v. King, 50 N. W. 623; 6 Dak. 131.

Fact that one of the jurors, in disobedience of a previous order of the court, left the jury box and joined in pursuit of the defendant, who had escaped from the court room during the trial, is not such misconduct as to require a new trial, when he, on returning, stated, in response to questions by the court, that he had not conversed with any one as to the guilt or innocence of the defendant. Dobson v. State (Ark.), 17 S. W. 3.

Sections 1910, 1966, R. S. Mo. 1879, do not apply to separations of the jury during the progress of the trial and before their retirement. State v. Orrick (Mo. Sup.), 17 S. W. 176 ; 106 Mo. 111.

But, under section 1909, R. S. Mo. 1879, separation of the jury during the trial in a felony case, though before they have retired to consider their verdict, will be ground for a new trial, unless it affirmatively appears that the jurors were not thereby subjected to improper influences. State v. Orrick (Mo. Sup.), 17 S. W. 176 ; 106 Mo. 111.

Where the sheriff, during the progress of a murder trial and before the retirement of the jury, took them from his house to the jury-room, leaving behind one juror who, before the sheriff's return, left his room and joined the sheriff's family in the house, the court, when the sheriff and juror testified that he was not subjected to improper influences, was held warranted in finding that defendant was not prejudiced by the separation. State v. Orrick (Mo. Sup.), 17 S. W. 176 ; 106 Mo. 111.

An assignment of error, in that the jury were allowed to separate after being impaneled and sworn in a criminal case, is not ground for reversal, where it is not alleged that they were not admonished by the court, under Crim. Code Neb. section 484, providing that, if the jury are permitted to separate during the trial, they shall be admonished by the court as to their duties until the cause is finally submitted to them. Langford v. State (Neb.), 49 N. W. 766 ; 32 Neb. 782.

The fact that some of the jurors, during their deliberations upon their verdict, are taken by the bailiff, under the orders of the court, from the jury-room to the water closet and returned, if nothing of a prejudicial character occurs during such separation, is no ground for setting aside the verdict and granting a new trial. State v. Flack (Kan.), 29 P. 571 ; 48 Kan. 146.

Where, under sections 4442, 4458, 4450, 4462, 4470, Iowa Code, the jury agreed, in a prosecution for keeping a liquor nuisance, upon a verdict of guilty, sealed and delivered the same to the officer and then separated, each going his way, a judgment on such verdict will be set aside, though the jury, two hours after such separation, reconvened and delivered the same verdict in open court. State v. Fertig (Iowa), 50 N. W. 545.

Fact that the offense charged was a misdemeanor, is immaterial. State v. Fertig (Iowa), 50 N. W. 545.

The denial of a motion for a new trial, made upon the ground that there had been an illegal separation of the jury, is in the discretion of the court, where the proofs raise a question of doubt. People v. Buchanan, 145 N. Y. 1 ; 64 S. R. 427 ; 9 N. Y. Cr. 428.

---

## NOTE ON "COMMENT ON OMISSION OF DEFENDANT TO TESTIFY IN HIS OWN BEHALF."

It is improper for the counsel for the prosecution to make any reference to the failure of the accused to take the stand. Wilson v. United States, 13 Sup. Ct. 765; 149 U. S. 60.

Comment by prosecuting attorney in argument on the failure of a defendant to testify upon any particular point, is improper. People v. Sanders (Cal.), 46 P. 153; State v. Fairlamb (Mo. Sup.), 25 S. W. 895.

No allusion can be made as to the failure of defendant to go on the witness stand on a former trial. Richardson v. State (Tex. Ct. App.), 27 S. W. 139.

So, no illusion to the fact that he has not testified at the pending trial, can be made. Brazell v. State (Tex. Ct. App.), 26 S. W. 723.

Nor, can any comment, which reflects on such failure, be made. Dawson v. State (Tex. Ct. App.), 24 S. W. 414.

But a remark, made before defendant had refused or failed to testify, is not a violation of the statute.   Diebel v. State (Tex. Ct. App.), 24 S. W. 26.

Comment by prosecuting attorney, in making his argument to the jury, on defendant's failure to testify, is reversible error.  Hunt v. State, 12 S. W. 727; 28 Tex. App. 149; Johnson v. State (Tex. Ct. App.), 20 S. W. 980; 31 Tex. Cr. R. 464.

Section 223, Ky. Crim. Code, which provides that a defendant's failure to testify shall not be commented on, or be allowed to create a presumption against him, does not prevent the prosecution from asking him on the trial, why he did not testify on the examining trial.   Taylor v. Commonwealth (Ky), 34 S. W. 227.

Subsequent charge to disregard comment of the prosecuting attorney upon defendant's failure to testify does not cure a violation of the statute forbidding comment.  Commonwealth v. Holtham (Quart. Sess.), 1 Lack. Leg. N. 370.

In Alabama, it was held that a bastardy proceedings, though penal in character, is not a criminal prosecution, within the meaning of section 4473, Code, which forbids counsel from commenting upon defendant's failure to testify in his own behalf.   Miller v. State (Ala.), 20 So. 392.

It was held erroneous for the prosecuting attorney to state, in a reply to a remark of defendant's counsel as to producing witnesses, "You know the laws of this state permitted the defendant to remain silent, and it would be improper and cowardly for me to comment upon it, and it is not my intention to evade the spirit or letter of the law."   State v. Holmes (Minn.), 68 N. W. 11.

Under section 1741, Miss. Code, comment by counsel upon defendant's failure to testify is ground for reversal, though the court rebuked him and directed the jury to disregard the fact alluded to, and counsel asked that his remarks be considered as withdrawn.   Sanders v. State (Miss.), 18 So. 541.

Statement by prosecuting attorney, in his closing argument, that "not a particle of evidence has come to you from defendant, from his side of the case," was held not a comment on defendant's failure to testify, within the prohibition of cl. 4, § 1798, Ind. R. S. 1881. Frazer v. State (Ind. Sup.), 34 N. E. 817.

Comment by attorney general to the jury, on trial of an indictment charging defendant with keeping a house of ill-fame, that it was improper for him to remark upon the failure of defendant to testify, but it was her duty to meet those charges, etc., though disapproved, was held insufficient ground for a new trial, where no objection was made at the time, and no request was made to charge the jury not to consider it.   State v. Hill (R. I.), 26 A. 191.

Conviction should be set aside, when attorney for the prosecution, though interrupted by the court in saying, in his argument to the jury, "Defendant has not taken the stand, which is his privilege under the law, and no inference can be drawn from the fact," continues such comment by saying that "defendant has immolated himself on an altar of his own erection." Yarbrough v. State (Miss.), 12 So. 551.

Statement by state's attorney, made in argument in presence of the jury, that "they have the same right to put the defendant upon the stand, and let him tell his story, the same as we have," is in violation of section 3636, Iowa Code.   State v. Baldoser (Iowa), 55 N. W. 97.

Testimony of defendant, in his own behalf, as to the single question of self defense makes him a witness in the case, and permits the prosecuting attorney to comment on defendant's failure to deny certain testimony in relation to facts of which he must have had knowledge. Lee v. State (Ark.), 19 S. W. 16.

Under section 13, article 1, Constitution, and section 2643, General Statutes, unfavorable comment by the prosecuting attorney in his argument upon the fact that defendant had not gone upon the stand, will not, though improper, cause a reversal, when the court, by charging that no inference can be drawn therefrom, checks any evil consequences. State v. Howard (S. C.), 14 S. E. 481.

Statement by attorney for commonwealth that, though he had no right to swear, he had the right to prove the statements of the accused, does not violate section 3897 Virginia Code. Sawyers v. Commonwealth (Va.), 13 S. E. 708.

Allusions of prosecuting attorney, in his argument to the jury, to defendant's failure to testify in his own behalf, if withdrawn on exception, furnish no ground for a new trial, where the court declares them improper and directs the jury to disregard them. State v. Chisnell (W. Va.), 15 S. E. 412.