PATTERSON, RUMSEY, McLAUGHLIN and HATCH, JJ., concurred.

Judgment reversed and defendant discharged.

## Court of Appeals.

June, 1900.

## PEOPLE v. JOSEPH MULLEN.

(163 .N. Y. 312.)

1. MURDER—TRIAL.

Defendant, upon the trial, admitted writing a memorandum in a book foretelling the death of his wife and himself by his hand, but swore in his own defense that the real agreement was that his wife should be the murderer, and the writing was to save her from the consequences of her crime should her courage be insufficient for self execution after killing him. The court charged the jury that they had his written statement and his sworn testimony, and that they were at variance and asked the jury which they were going to believe. *Held,* no error, that the charge did not treat the statements in the book and the testimony as narrative of the crime by the one or the other; that a view of the memorandum which regards it as merely evidence of intention was too narrow, and that the charge was put with such clearness and force that there was no opportunity for confusion as to whether the memorandum spoke before or after the event.

2. TRIAL—CROSS EXAMINATION.

A judgment of conviction will not be reversed on the ground that the court gave the district attorney too much latitude in his cross-examination, where the questions asked did not elicit answers that were at all injurious to the defendant.

APPEAL from a judgment of the Court of General Sessions of the Peace for the city and county of New York, entered May 15, 1899, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

William F. Howe, for appellant.

Charles E. Le Barbier, for respondent.

PARKER, Ch. J.   Shortly before midnight on the third of June, 1898, Officer Hampshire, of the New York police force, while standing on the corner of Seventy-ninth street and Riverside drive, heard a noise and a cry for police; running in the direction from which the sound came, he soon found himself in the basement area of number 331 West Seventy-eighth street, and looking through an iron gate which barred his entrance he saw two figures, one a woman in a reclining position with her back toward the gate, the other a man standing and apparently looking out toward the street, from whose mouth a moment later came a gurgling sound followed almost immediately by his falling across the woman.   There were no other occupants of the room, and Officer Hampshire hastened up to the front door of the house, which was soon opened, and thence he quickly found his way into the basement, pulled the man off the woman and laid him across the door sill. Though both man and woman were unconscious, both were living.   By the side of the woman lay a revolver, and an examination disclosed that a bullet from it had entered the woman's neck on the right side, and after chipping off a portion of the vertebræ had lodged just behind it, while another bullet had penetrated her left thigh, severing the femoral artery and imbedding itself in the tissues.   A third bullet had been fired into the mouth of the man, making an ugly wound which resulted in unconsciousness, but did not prove fatal.   The woman died within a few minutes after the arrival of the officer.   It was soon discovered that the parties were husband and wife, having been married on the 10th day of November, 1895.   The man recovered from his wound and an indictment was found against him, wherein he was charged with the crime of murder in the first degree, and on the trial it was shown that shortly after his marriage to Johanna O'Brien

in November, 1895, she drew out of the savings bank three hundred dollars, and either gave or loaned it to him, after which he went to Ireland, returning to his wife after the money had been expended; they afterwards applied for and obtained in a family the positions of coachman and cook, respectively. After a few months of work defendant was sentenced to the penitentiary, where he remained until three days prior to the homicide. Immediately upon his release and on the first day of June he called upon his wife, who was serving as cook in number 331 West Seventy-eighth street under the name of Johanna O'Brien. He spent some portion of that day and evening and of the next with her, and on both evenings they went out walking together, but on the third the chambermaid wished an evening out and so the cook stayed in, and her husband, the defendant, stayed with her. It was about ten o'clock when the chambermaid returned, and she testified that she found the defendant and his wife sitting by the kitchen table, and she sat down in the room with them, where all remained until about half-past ten or eleven o'clock, when Johanna said to the defendant, " It is now time for you to go home." The defendant smiled but made no answer, and together they started toward the basement stairs, which they descended, and then the witness says they quarreled, although all she could remember having heard was a scream by the deceased, followed by an exclamation by her, " Oh! Joe," after which she heard a pistol shot. The People also introduced in evidence a small book which the police officer found in the defendant's pocket in a search made almost immediately after the officer took the defendant away from his wife and laid him across the sill. That book contained a memorandum in the handwriting of the deceased, which reads as follows:

" DEAR FRIEND.—Whoever you may be that finds us first, and finds this note, don't blame me.

" This sad affair is not my fault. My wife is as much to

blame as me. I am doing this dreadful thing because I love my wife, and she will not do what I want her to do. She has been away from me for eighteen months, and I have asked her to go to look for a place with me as man and wife, and she will not do it, and she is causing me for things in the wrong, and she puts the blame on me and I put it on her. So she is not happy, nor I am not happy either. So I thought that, with my one hand, I would end her life and mine, in each other's arms. So she said it would be the best thing. Then we would be out of our troubles, and so I think that I can say no more in the matter, only that it is all love of my wife what made me do it.

" So I ask the world at large to forgive me for what I have done. It is better for us both, and I hope that the Lord will forgive me for doing this, and I ask one request, and that is, to bury me and my wife by my side, as we were found.

" This is a very hard lot to write. My hand shakes so much so I have no more to say, only God bless all my enemies and everybody.

" I will put no address on this note. From a heartbroken husband.

JOSEPH MULLEN.

" Born in Ireland, in the county Derry, in the year 1870.

" And now it is my own life and my loving wife's with one hand. There are no jealousy in this case. The whole fault is my wife's mother that has brought all this on. The Lord forgive her, for she don't know what she is talking about no more, only that she and my dear love will be happy in Heaven together. The people in this world won't let us be happy. Maybe the ones in the next will. This note, please take this to Mrs. O'Brien, No. 6 Cole street, Jersey City.

" June 3d, 1898."

The defendant was the only witness sworn on the part of the defense, and he testified that his wife did the shooting; that the revolver was hers, and that she told him that she had

purchased the ammunition on that day.  His version of the story was that his wife was very much discouraged as to their future, especially because of the fact that he was an ex-convict, and she insisted that people would not employ them, and if they were employed, the story would come to the ears of their employers after a time, with the necessary result of their being discharged.  To his suggestion that they would not find it out, she insisted that her people hated him so that it was impossible to hope to keep his past to themselves; she suggested on the second day of June that he visit her mother on the morning of the third and see if the strained relations existing between them could not be improved, and he attempted to carry out that suggestion, but his mother-in-law opened the door, and as soon as she recognized him slammed the door in his face.  His story was intended to convey the impression that this act of the mother-in-law was regarded by his wife and himself as demonstrating that their gloomy forebodings as to their future were unquestionably well founded, for he testified:  "We had come to the conclusion the way everything was going against us, and the way her mother was and the strain she put on her, her mind and mine, we made an agreement at that kitchen table to do away with both in each other's arms."  The defendant's version of the nature of the agreement between himself and his wife, and how it came to be made and how executed, is told by himself in these words:  "Well, the agreement was come to, as my wife had been talking about doing suicide, and she said that she meant it, and I knew if my wife said a thing, she meant it, and I said, 'Well, Jo, if you are going to do away with yourself, you might as well do away with me first and yourself afterwards, because it will be a case of two, no matter how it goes;' and she said, 'Do you really mean what you say, Joe?' and I said, 'I do, if you do;' and so we agreed to die together at that table, and the first agreement was, she asked me if I would shoot her and then myself, and I said, 'No, Jo, I wouldn't shoot you, and I don't think I will have the courage

to shoot myself;' and then she said, she says, 'Wouldn't you have the courage to take—' she first stated—I asked her, '. What do you intend to kill us both with?' and she said, 'Don't you think carbolic acid would be the quickest?' and I said, 'No; if we take it, we are ready to be found and ready to be cured;' and she said, 'Well, you know that revolver what I have got in my trunk?' and I says, 'Yes;' 'Well,' she says, 'I have got that;' she says, 'We can shoot ourselves;' and I said, 'Where is the ammunition coming from?' and she said, 'I have got it;' and I said, 'How did you get ammunition?' and she said, 'I was out this afternoon in town and bought it,' she says, 'because I was intending to shoot myself anyhow, whether you did or not;' and I said, 'Well, if you have got ammunition, the shooting is the speediest and the surest;' so we come to the conclusion that my wife would shoot me and then herself, and she says that when .we went down—that was our agreement, what I wrote down in the book, and I wrote that agreement in the book that my wife was to shoot me in the mouth, or I had to shoot my wife— no, I am telling it wrong; but it is no odds, anyhow; the agreement that was made—I want to try to explain it all as straight as I can—the agreement was that she was to shoot me anyhow, and then herself; but I made the agreement to write in the book for the purpose of, if my wife shot me and failed for to shoot herself, that the book would clear her by my stating in the book that I died of my own hand. "

It will be seen, therefore, that the defendant upon the trial admitted writing the memorandum in the book foretelling the death of his wife and himself by his hand, but insisted that the real agreement was not that he should be the murderer, but that his wife should be, and the object of the writing was to save her from the consequences of her crime should her courage prove to be insufficient for self-execution after taking the life of.her husband. The examination of the witness covered many pages of the record, but it will serve no useful purpose to further advert to it; for of course no question is made that

the evidence was of such a character as to support a judgment of conviction for murder in the first degree, the contention of the learned counsel for the appellant in this court being that the court erred in its charge to the jury, and in overruling objections interposed by the defense to certain questions asked the defendant by the prosecuting officer on cross-examination. The portion of the charge of which complaint is made is as follows: " Now, therefore, it comes down to the question, Did the deceased kill herself or did this defendant kill her? As to that question you have his own statement made once in writing and once under oath, and they are at variance. Which statement, gentlemen, are you going to believe? The statement which he wrote out and left on his person, to be found after his death, or the statement which he now gives for the purpose of exonerating himself?" The contention of the learned counsel is that the charge treated both the statement in the book and the testimony given on the witness stand as narratives of the commission of the crime by the one or the other of the parties to it, and hence that the jury were given the impression that the memorandum of the defendant could · be treated by them as an account of the shooting, whereas it was in fact but evidence of an intention. The charge of the judge, as a whole, left no opportunity for a mistake on the part of the jury touching the nature of the memorandum, as will appear later on, but it should first be observed that the learned counsel for the defendant leaves out of consideration an important feature of the memorandum which speaks of something besides the intention of the party writing it. It tends to show the existence of an agreement between defendant and his wife that they should both die and by his hand, whereas his testimony is that they had not so agreed, but on the contrary that while the agreement was that they should die it should be by her hand. Thus it appears that as to the nature of the agreement the memorandum and the testimony were in conflict, and a view of the memorandum which regards it as merely evidence of intention is too narrow. But the charge of the court considered

in its entirety must have presented the real situation to the minds of the jury with perfect clearness, as we think, for in addition to that portion of the charge which we have quoted the court said, in speaking of this memorandum: " It is not the history which he gives of this transaction here on the witness stand, but it is the history which he gave of what was going to happen before it did happen. I will read so much of this statement made in writing before this transaction as gives the history of it by him at that time. " (The court here read part of the memorandum to the jury, after which the charge continued.) " That is the statement which the defendant says he wrote himself previous to the time when this homicide took place. When he was examined as a witness he admitted that he wrote it so that if his wife should succeed in killing him and not in killing herself she could clear herself from responsibility by pointing to this letter showing that he did it. " There are other portions of the charge bearing upon this question; that portion so far quoted, however, demonstrates not only that the jury was correctly informed of the character of the memorandum, but that the charge was put with such clearness and force that there was no opportunity for confusion as to whether the memorandum spoke before or after the event.

The other question presented relates to the cross-examination by the district attorney, and while we are inclined to agree with the defendant's counsel in so far as he urges that the court was disposed to give the counsel for the prosecution too much latitude in cross-examination, we are unable to assent to his claim that the judgment should be reversed on that account, for the reason that the questions of which complaint is made did not elicit answers that were at all injurious to the defendant.

The judgment of conviction should be affirmed.

O'BRIEN, BARTLETT, HAIGHT, MARTIN, VANN and LANDON, JJ., concur.

Judgment affirmed.