# Court of Appeals.

July 10, 1901.

## THE PEOPLE v. FRED KRIST

(168 N. Y. 19.)

1. MURDER.

The evidence tended to show that when the defendant shot his victim he knew the nature and quality of the act, that he bought a revolver, had it loaded and in readiness for action. He selected a convenient place to watch and went forth to meet her with intent to take her life as he declared, had a clear recollection of the act, etc., and there was no evidence of congenital defect or other disease of the body. Held· that the case was for the jury, that their conclusion was supported by the evidence.

2. SAME—INTOXICATION OF DEFENDANT.

Where the defendant deliberately drank himself into a frenzy, the law does not excuse him for that kind of insanity.

3. SAME—EVIDENCE.

The district attorney without repeating the words of a hypothetical question which has just been repeated, says without objection: "I repeat the defendant's hypothetical question." Held that while repetition might have led to a clearer and more certain understanding of the question by both witness and jury, it was not necessary, under the circumstances.

4. SAME.

It is proper to ask whether any fact or any group of facts sworn to is inconsistent with sanity.

5. SAME.

A practicing physician of long experience, who had known defendant for ten years, testified that he saw the shooting and observed the appearance of the defendant at the time; described the whole transaction and stated how the defendant looked and acted and on being recalled testified that from his appearance and manner at that time he did not see any indication of insanity. Held properly·admitted and not less incompetent because the acts observed were those which accompanied the shooting instead of immediately preceding it.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of Tioga, November 24, 1900, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Frank A. Darrow, for appellant.

Oscar B. Glezen, for respondent.

VANN, J.—The defendant was indicted for the crime of murder in the first degree, committed on the 7th of April, 1900, at the village of Waverly, county of Tioga, by shooting one Katie Tobin in the head with a revolver, and thereby causing her death. To this indictment he interposed the general plea of not guilty, and the special plea that at the time charged "he was of unsound mind and wholly irresponsible for his acts." Upon his trial in November, 1900, the jury found him "guilty of murder in the first degree as charged in the indictment," and judgment of death was pronounced against him.

The defendant, of German extraction, was born in Oswego county, and at the date of the homicide was about thirty years of age. His boyhood was passed chiefly in Ithaca, where for several years he served as an altar boy in the Catholic church of which he was a member. Those who observed him at this period of his life remembered him as a good boy and quite strict in complying with the tenets and formalities of the church. When fifteen years of age he went to Waverly where he has since resided, and during most of the time has worked steadily in a furniture manufactory. His employers and others testified, without contradiction, that he was an exemplary young man of good character and steady habits. On the 6th of May, 1891, he was married to Josephine Ganther, with whom he lived until September, 1899, when they separated and have lived apart ever since.

At some time during 1898 he became deeply attached to Katie Tobin, an unmarried woman then about eighteen years

of age, who resided with her parents in the village of Waverly. She and her family attended the same church that he did, and they met occasionally there and elsewhere, but for a while their intercourse attracted no particular notice. She permitted his attentions and returned his affection and finally they became infatuated with each other. He did not conceal his attachment for her even from his wife, who finally asked him "if he intended to give up that girl," and when he answered "no," she left him. Extreme intimacy does not appear to have existed between them until in January, 1900, when both suddenly disappeared. The next heard of them was in Wilkes-Barre, Pennsylvania, where they lived together as husband and wife for about a month under the name of Mr. and Mrs. Hyland. When their whereabouts became known to her family, her mother and Mrs. Donahue, her sister, went to Wilkes-Barre and brought her back to Waverly without the knowledge of the defendant, who was absent at work. He soon learned the fact, abandoned his work and returned to Waverly, where he made incessant efforts to see her, but without much success, owing to the vigilance of her friends, who were determined to keep them apart. She was willing to meet him and tried to answer his signals, but her friends prevented them from coming together, except in two or three instances. Her mother told him that he was a married man and could not go with her daughter any more, and Mrs. Donahue vehemently reproached him for going with her sister, when he had a wife. He was repeatedly ordered out of the house by different members of the family, and on one occasion, about four days before the homicide, Katie's father drove him away with a club. It became obvious in various ways that further intimacy with Katie was practically impossible.

Up to this time he had never been known to use intoxicating liquors, but on Friday, April 6th, he began to drink gin in immoderate quantities. That night he persuaded his wife, who, throughout his troubles, has been his faithful friend, to go with him to his rooms at the house of a neighbor, and while

she did not intend to remain, he coaxed her to stay and she did not leave until half-past four in the morning, when he went with her to a millinery store that she conducted. During the night he could not sleep, but walked the floor, wrung his hands, wept and talked continually about Katie. He was under great excitement and kept saying, " she has ruined my life and I will murder her," or " will murder them." In the morning, shortly after seven o'clock, he went to a hardware store and purchased a screw hook, and when he had paid for it went over to the showcase which contained revolvers and asked " the price of guns." Upon learning the price he examined several and finally purchased one with some cartridges, and asked the clerk to load it for him. The clerk replied that he was not in the habit of doing that business, but the defendant said he was not used to loading a gun and wished him to load it. The clerk declared he was afraid of a loaded revolver, and the defendant said the guns that are never loaded are the ones to be afraid of. The clerk said that was a good deal so, whereupon the defendant laughed, the revolver was loaded and handed to him with the rest of the cartridges, and putting them in his overcoat pocket he walked out of the store. He had a revolver in his possession before this, but a fellow-workman, who roomed in the same house, seeing him wild from drink on the night before this purchase, took it away and concealed it.

About three hours after he bought the revolver he hired a room at the Warford House, a hotel in Waverly, where he had previously boarded and had occupied a room known as No. 22. He asked for and was assigned to this particular room, which commanded an unobstructed view of the house where Katie Tobin lived, and of the sidewalk leading from her house to the hotel, and to the office of the police justice of the village. During the day he ran up and down stairs very fast, thirty or forty times, and frequently visited the barroom, where he continued to drink gin. He went in to dinner at the usual

hour, but said he did not want anything except a cup of tea or coffee.

The afternoon before he had applied to the police justice for a warrant against Katie Tobin, claiming that she had taken $35 out of his vest pocket. The justice put him off that night, but the next morning he came again, renewed his request and insisted that a warrant should be issued. The justice tried to talk him out of it, telling him that he did not think he had a case, but he pressed hard for a warrant and said, " All I ask of you is to issue one and that will settle the whole question." He asked the justice to go over and see Katie Tobin and have her come to the office and meet him, saying, " That is all I ask, just to see her; if I can get to see her that is all I want; I am sure we can arrange matters." The magistrate refused to go, and at some time during the afternoon the defendant came again and said that an attorney of the village, whom he had consulted, advised that the warrant should be issued; but the justice still refused. He went away and finally came back at about four o'clock with an affidavit, which he had employed another attorney to prepare, and thereupon the police justice issued the warrant and delivered it to the defendant, who handed it to the chief of police, saying, " There is a warrant; she is over there now; I have been where I can watch the house, and I saw her go in there a short time ago, and I know she is there." The officer went to the Tobin house, but did not find Katie, and so informed the defendant, who said, " Well, I know she is there." When the officer replied, " Well, I could not find her," the defendant said, " I will get even with those damned Tobins yet, God damn them. Excuse me for swearing; you never heard me swear before, did you? I have been drinking some gin, and I will get even with those Tobins."

In the meantime it had been arranged between the magistrate and Mrs. Donahue, Katie's sister, that they should appear at his office at half-past five that afternoon, and shortly after five he went to the store of the defendant's wife, where

he found him and notified him of the arrangement. He rushed out of the door in great haste, ran to his room in the Warford House, hurried down stairs to the barroom, asked for some gin, but the gin bottle was empty, and thereupon he called for some whisky and drank it. At this time Katie and her sister had left their home and were on the way to the office of the police justice. The defendant met them about half way, in a public place and in plain sight of many people, took hold of Katie's arm and said, " Katie, you won't go." Mrs. Donahue told him not to touch her sister, whereupon he raised a revolver, placed it near Katie's head and fired. She fell instantly, unconscious and mortally wounded. Mrs. Donahue sprang in front of him, caught him by the arm that held the pistol, but when she saw the body of her sister lying upon the ground, she became dazed and dropped his arm. He then shot three times at the prostrate body, making no attempt to shoot Mrs. Donahue, turned and walked a few steps toward the chief of police, who was running toward him, threw down the revolver and was at once placed under arrest. Katie Tobin died in about thirty minutes from a bullet wound in her left temple. Another bullet was found embedded in a handkerchief, which was in the bosom of her dress.

On his way to the police station he told the arresting officer that he loved Katie and she loved him; that he had killed her and was willing now to die for her; that she had always said she was willing to die for him and now he was willing to die for her; that all he cared about was his poor mother and he did not know what she would do. When asked if the warrant " was a put up job to get hold of " Katie, he replied yes, that all he wanted to do was to shoot her and that if the officer had had her in his custody he would have shot her right down; that he would have shot her in the justice's office; that he had to fill up with gin to get the nerve and that when he was talking with the officer in the town hall he had that gun in his hand in his pocket. The officer told him that if he had known it he would have taken the revolver away from

him, and he said, " I wish you had stopped me." The officer did not notice that he was under the influence of liquor when he arrested him, but he soon showed, through excitement rather than stupor, that he was intoxicated.

Upon reaching the police station he met the police justice, who said, " My Heaven, Fred, what does this mean? " The defendant replied, " I did it; yes, I did it; they drove me to it." He was asked, " Who do you mean," and he said, " The Tobins; they have tried to keep me away from her, and they have done everything they could to keep me away from her, and I have shot her and it is all right and I expect to suffer for it." Soon he burst out crying and exclaimed, " What will my father and mother say? " then straightening up he said, " I killed her, I killed her; you little thought for the last two days I have been after you for a warrant that murder was in my heart, but it was there just the same; my only object in getting this warrant out was to meet her; I tell you right now she did not steal a penny of me—not a penny; don't for one minute think she took a cent of my money; I swore to a lie when I got the warrant out." He was asked how he had the nerve to do it and he said, " I didn't have it myself; I knew I was going to do a desperate deed and I went and poured the gin down me." When asked why he drank gin he answered that he had been told it was stronger and took effect quicker. He said that he took the room at the Warford House because it commanded a view of the Tobin residence, and that immediately after the magistrate notified him of the time to meet at his office, he went to his room, took a drink of gin, and when he saw Mrs. Donahue and Katie coming he went to meet them, saying to Katie, " Let us take a walk over on the south side," but she would not recognize him and he knew it was all up, pulled the gun and fired. He declared that he knew he would have to suffer for what he had done and was perfectly willing to, and the sooner it came the better. While in the station-house he said that when he saw Katie and her sister leave their home he started out with the intention of killing them both,

but he seemed to " go blind " after he shot Katie and could not see Mrs. Donahue; that he had killed Katie and was glad of it, and was sorry he did not kill her sister. Later he declared that he purchased the revolver in order to kill Katie because they tried to keep her away from him; that he intended to kill Mrs. Donahue and then go over and shoot her father and mother.

To the keeper of the lock-up he said he was driven to do it and had to do it; that they were pounding Katie black and blue and she had often begged him to take her away; that he killed her, the girl he loved, and was forced to do it; that he had planned to kill four, Katie, her two sisters and his wife and then to go to the stationhouse and give himself up, but he failed; that he got drunk in order to do it; that Mrs. Donahue might thank her stars she was alive, for he didn't know why he did not shoot her as he intended to. When asked if he had anything against Katie, he said, " No, I loved her; I was crazy over her and she was crazy over me."

The same night on his way to the county jail at Owego, the sheriff asked him how he came to do the act, and he replied that God bade him to kill her and he had to do it; that she was willing to die for him and he was willing to die for her; that he wanted to be electrocuted, didn't want any lawyer and " didn't want any insanity business; " that he had killed this girl and he wanted to be killed, and he kept speaking about the gin he had been drinking and its bad effect upon him.

To a newspaper reporter he said shortly after the shooting, " I killed her because I loved her, and they kept me away from her; I had to get awful drunk to do it; I knew I didn't have the nerve." When asked if he had intended to do this at any other time, he replied, " No, I had planned to kill her to-day, Saturday."

While in jail awaiting trial he frequently exclaimed, " My God! why did I do this," and in this connection would say that he was perfectly willing to die; that he did not see why

there was any use of having a trial, or why he could not plead guilty and go to the chair as any one " who would do anything like that ought to." He declared that he was not crazy and never had been; that he did not want any lawyer, but simply wanted to die and go to Heaven, where he would be with Katie. He made similar declarations to other witnesses, and at no time attempted to conceal or excuse his offense.

Evidence was given tending to show that the defendant was in good health and in sound physical condition; that until about the time he separated from his wife he had been of a uniformly genial and pleasant disposition; that after that a change was observed in this respect, and he did and said things which were pronounced irrational by various witnesses, but substantially all of these acts and declarations were done or made with reference to his relations with Katie Tobin. Some witnesses thought the acts irrational because they were immoral and others because they were unnatural and " different from his usual behavior." He talked freely with all about his love for Katie and her love for him and seemed agitated and troubled. The most of the witnesses observed nothing unusual about him, except his fondness for Katie and his disposition to talk a great deal about her, until within a day or two of the homicide and after he had commenced drinking. He was then nervous and agitated. He could not sleep. The expression of his face was wild, his muscles twitched, his eyes were staring and he seemed low-spirited and despondent. He complained of feeling downhearted and blue, walked the floor, wept and wrung his hands. Sometimes his face would be flushed and then pale without any apparent cause. Substantially all of this occurred after Katie's family had rigidly excluded him from her society, and chiefly within a week of the homicide, with especial prominence after he began to drink. There was no evidence of insanity in his ancestral line, but, about eight years before the homicide, one of his brothers was temporarily treated for insanity in the form of melancholia, resulting from physical disability.

A medical expert, called by the defendant, in answer to a carefully framed hypothetical question, embracing the leading facts, none of which were disputed, pronounced him of unsound mind and stated; "The form of insanity that he had may be classed as emotional insanity and a little later it would seem to merge into a melancholia." Doctor Wagner, superintendent of the Binghamton State Hospital for the Insane, was sworn for the People, and, answering the same hypothetical question, testified that the facts were insufficient to establish insanity; that what is called emotional insanity is not recognized by medical science as a form of insanity at the present time; that melancholia is a form of insanity, and that its characteristics are extreme mental depression, associated with delusions and hallucinations; that the hallucinations are errors of eye-sight, hearing and the like, as where the patient imagines that he sees an object when there is none, or hears a voice when no sound strikes his ear; that there is a drooping appearance, the corners of the mouth are drawn down, the forehead is furrowed and corrugated, the expression of the eyes is downcast, and there are usually tears in the eyes, but never a staring expression. "In melancholia the eyes are just the opposite (of staring); the melancholiac is rarely willing to look you in the face, but turns away and avoids his fellows, and is exclusive. * * * The person so affected would not, as a rule, be apt to seek every opportunity to tell his troubles to others, and the almost invariable rule is that patients suffering from melancholia avoid other people; the general rule is simply this, that if there are no other indications of insanity you can never tell an insane person by any peculiarity of the eyes." The learned doctor further testified that "the fact that the patient's brother at some period had been temporarily insane would have no bearing unless insanity appeared in the ancestral line, in the father, mother or the grandparents before him." Two other experts called by the People, in answer to the same hypothetical question, pronounced the defendant sane at the time of the shooting.

While no act of an insane person is a crime, there is no exemption from criminal liability on account of insanity, except upon proof that, at the time of committing the alleged criminal act, the accused was laboring under such a defect of reason as either not to know the nature and quality of the act he was doing, or not to know that the act was wrong. Penal Code, §§ 20, 21. No act committed by a person while in a state of voluntary intoxication is deemed less criminal by reason of his having been in that condition, although the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive or intent with which he committed the act. Id. § 22. A morbid propensity to commit prohibited acts, existing in the mind of a person who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor. Id. § 23.

The evidence tends to show that when the defendant shot Katie Tobin he knew the nature and quality of the act he was doing. He bought a revolver, had it loaded and in readiness for action. He selected a convenient place to watch, and by diligence and wariness created an opportunity to meet his victim. He went forth to meet her, as he had planned, and deliberately shot her, with intent to take her life, as he promptly declared. Right after the act he had a clear recollection of all the events which preceded the shooting, and there is nothing to indicate that he did not know what he was doing, or that he failed to comprehend the character and consequences of his conduct. That he knew the effect of firing a bullet into the brain of a human being is a reasonable, if not an irresistible inference from the evidence. He knew it would kill, for he said at once that he had killed and intended to kill. He was laboring under no delusion that some fact existed which, if it were true, would excuse his act, unless his declaration, made after the fact, and unsupported by the surrounding circumstances, that God commanded him to do it, may be regarded as some evidence of hallucination. All his other declarations,

many in number and made to many different persons, were inconsistent with a sincere belief that he was acting under the direction of a superior power. He seemed to have a perfect understanding of the nature of the act, and to know when he committed it what the effect of it was with reference to the crime of murder. He acted with judgment, caution and foresight. There was no sudden impulse, for the act was the result of long and careful preparation. There was no evidence of congenital defect, or other disease of the body, which might affect the mind, for he was apparently in good health.

Did he know that the act was wrong? Had his mind slipped from its moorings, so that he was unconscious of the criminal character and consequences of his action? Was he mentally capable of entertaining a criminal intent? Did he comprehend his relations to others and realize the nature and enormity of the act? Did he know the difference between right and wrong and have the power to choose between them? Did he know that it was wrong to shoot Katie Tobin? These questions were for the jury and they might find the answer in his own declarations made immediately after the homicide, that he plotted to kill her, nerved himself with gin in order to do the desperate deed, did it as he had planned, regretted it on account of his mother, expected to suffer for it, and was willing to plead guilty and be punished as any one, "who would do anything like that, ought to." He promptly sat in judgment upon himself and seemed to fully realize that what he had done was wrong, both legally and morally, and that he would be and should be punished for it.

If he deliberately drank himself into a frenzy, the law does not excuse him for that kind of insanity. His intoxication did not affect his criminal responsibility, for it was not only recent and voluntary, but he even drank with the crime in view, as he said, and in order to get the strength and courage to commit it. Both the statute and the common law declare that voluntary intoxication constitutes no defense. Penal

Code, § 22; People v. Rogers, 18 N. Y. 9; Flanigan v. People, 86 N. Y. 554.

Upon the merits we think the case was for the jury, and that it was for them to decide whether the defendant was legally responsible for his acts, which was the only contested issue. Their conclusion is supported by the evidence, and we cannot substitute our judgment for theirs, as they saw the witnesses, and the law makes them the exclusive judges of all questions of fact. Code Crim. Pro. § 420. The charge was full, fair and clear, with no request made and no exception taken. We are not satisfied that the verdict was against the weight of evidence, or against law, or that justice requires a new trial, or that we should interfere with the judgment by virtue of the power intrusted to us of reversing without an exception. Code Crim. Pro. § 528.

The defendant seeks to predicate error upon the following question asked by the People of a medical expert called in their behalf, to wit: " Assuming all the hypotheses stated in the hypothetical question put to Dr. Barrett, what do you say as to this man's condition on the 7th of April last—I repeat the defendant's hypothetical question? " This question was not objected to, and it called for an answer to the precise question that had been previously put by the defendant's counsel to the expert called by him. While the question was not literally repeated, the district attorney said he repeated it, and without objection as to form or otherwise it was answered. The witness to whom it was put was called immediately after the defendant's expert had answered the long hypothetical question, covering about three pages of the printed record, which the district attorney sought to abridge in the manner stated. As court had not in the meantime adjourned, the question was fresh in the minds of the jury, and the witness testified that he heard it. No suggestion was made that it was not perfectly understood. Upon the cross-examination of two of the People's experts the same question was asked in substantially the same way by the defendant's counsel. The

original hypothetical question was proper in form, as both parties concede, and after it had been asked by the defendant's counsel it was adopted by the district attorney as the basis of his examination. To save time he did not literally repeat it or cause it to be read. While repetition might have led to a clearer and more certain understanding of the question by both witness and jury, it was not necessary to literally repeat it, but it was sufficient, under the circumstances and in the absence of any objection or suggestion, for the district attorney to simply say, " I repeat the defendant's hypothetical question."

The only exception argued by the appellant's counsel was taken to the ruling which permitted the following question to be put to one of the experts for the People, to wit: " Take the case of a young man, about thirty years of age, who has led a fairly even and uneventful life, and not addicted in any manner to the use of intoxicating liquors, who, at one time, for two days in succession, indulged excessively in the drinking of gin, who, at about the close of the second day shoots to death upon an open street a young woman with whom he was in love; who, about six hours afterwards, while in the custody of the officers, exhibits strong evidence of excitement, manifested by walking up and down and wringing his hands, explosively crying and talking very much about the occurrence, with twitching muscles—would such an exhibition on his part be inconsistent with his sanity? " This was objected to upon the ground that the question did not assume any considerable part of the facts proved in the case, but the objection was overruled, the defendant excepted and the witness answered in the negative. The witness had already answered the longer hypothetical question as prepared by the defendant's counsel, which recited all the material facts. The question was upon the redirect examination of the witness, and did not call for an opinion as to the defendant's sanity, either upon the facts assumed or upon all the facts of the case. It simply asked whether certain acts, characterized as irrational by witnesses who observed them, were inconsistent with sanity.

We find no error in this ruling. It was a method of analyzing the hypothetical question. It is proper to ask whether any fact or any group of facts du.y sworn to is inconsistent with sanity. Filer v. N. Y. C. R. R. Co., 49 N. Y. 42, 46; Lawson's Opinion Evidence, 166. The question did not assume that they were all the facts of the case, but sought to test the effect of certain specific facts in evidence, upon the theory that they might all be accounted for by the excessive use of intoxicating liquor by the defendant.

A practicing physician of long experience, who had known the defendant for ten years, testified that he saw the shooting and observed the appearance of the defendant at the time. He described the whole transaction and stated that the defendant seemed to be " very cool and collected and stood and walked as steadily as I ever saw any one; his face was somewhat flushed, but had nothing more than his natural look; he had a somewhat florid complexion." After the defendant had produced testimony upon the question of insanity and had rested, this physician was recalled and the district attorney asked him: " From his appearance and manner at that time," referring to the time of the shooting, " did you see any indication of insanity ? " This was objected to upon the ground that it is improper to base an opinion of an expert witness simply upon one set of circumstances in a case and his observation at the moment of the act; but, subject to exception, the defendant was allowed to answer, " No, sir, I did not." The opinion of a medical expert may be based on observation or upon personal examination, or upon a hypothetical question. Even one not an expert may describe actions and state whether they appeared to him to be rational or irrational. The question under consideration called for the opinion of an expert as to whether the acts of the defendant, as he observed them at the critical moment, seemed irrational. Expert evidence is received upon the theory that the questions involve matters which lie beyond the scope of the observation, knowledge and experience of men in general, and that consequently the jury are

not presumed competent to arrive at a proper determination by the unaided exercise of their judgment on the facts. Dewitt v. Barley, 9 N. Y. 371, 375; 1 Greenl. Ev., § 440; Best's Prin. of Ev., § 346. If the physician had observed the conduct of the defendant an hour before the homicide, his opinion as to the rationality of his words or acts at that time would have been clearly competent. Was it less competent because the acts observed were those which accompanied as well as those which immediately preceded the shooting? We think the ruling was proper. People v. Youngs, 151 N. Y. 210; People v. Taylor, 138 N. Y. 398, 405; People v. Kemmler, 119 N. Y. 580, 585.

Owing to the gravity of the case, we have considered all the rulings appearing in the record, whether excepted to or not, but we find none which did injustice to the appellant. We think he had a fair trial and that the judgment against him should be affirmed.

PARKER, Ch. J., GRAY, BARTLETT, HAIGHT and WERNER, JJ., concur; O'BRIEN, J., not voting.

Judgment of conviction affirmed.