(117 App. Div. 40)

PEOPLE v. KOERNER.

(Supreme Court, Appellate Division, First Department. January 11, 1907.)

1. CRIMINAL LAW—TRIAL—JURY—REQUESTED CHARGES.

 The jury in a homicide case returned to court and requested the court to inform them whether one juror could legally, if he believed in one degree, for the purpose of agreeing with the other jurors, change his vote from a greater to a less degree. The court responded that the verdict of the jury should express the true belief of each juror. *Held*, that the

court properly refused defendant's request to inquire whether the jury could possibly agree on a verdict.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 2065–2067.]

**2. SAME.**

The court, after refusing to inquire whether the jury could agree, properly refused to hear defendant's counsel state the grounds of his motion to thereon discharge the jury.

**3. SAME.**

The court, on the jury returning a verdict in a homicide case, properly refused to hear the counsel for accused before the verdict had been received; for, if counsel had any complaint that the verdict, when rendered, was improper, he had, under the provisions of Code Cr. Proc. §§ 462–466, relating to new trials, ample remedy to protect the rights of accused.

**4. SAME—COERCING AGREEMENT.**

The jury, in a homicide case, returned a verdict after having deliberated 57 hours. A few hours before, the jury intimated that they were unable to agree. The court requested them to make further endeavor to reconcile their differences. *Held*, that the jury was not coerced into bringing in a verdict.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 2069.]

**5. SAME—DISCRETION OF COURT.**

The length of time the jury in a criminal case shall be kept together deliberating on their verdict rests in the sound discretion of the trial court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 2072.]

**6. SAME.**

Where the trial judge in a criminal case believes that some one in the courtroom is indicating to a witness the manner in which he shall answer the questions put to him, the proper practice requires the court to direct the jury to retire while investigating the matter by asking the witness questions relating thereto, and thereby prevent the jury from being unduly influenced by the court's action on coming to consider the testimony of the witness.

**7. SAME—APPEAL—HARMLESS ERROR.**

The trial judge in a criminal case thought some one in the courtroom was indicating to a witness the manner in which he should answer the questions put to him, and he thereupon directed the district attorney to make an investigation of the matter by asking the witness certain questions, without directing the jury to retire. On the following day the court expressly charged the jury to disregard what had happened the day preceding so far as the incident in question was concerned. *Held*, that the action of the trial court did not constitute reversible error.

**8. SAME—MENTAL INCAPACITY—EVIDENCE—ADMISSIBILITY.**

Where, on a trial for homicide, the evidence showed that immediately after the killing accused collapsed, and remained unconscious until restored to consciousness by physicians; but the prosecution claimed that accused was shamming, it was error to permit a witness to state the symptoms manifested by one who is shamming unconsciousness.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1071.]

**9. SAME—APPEAL—ERRONEOUS ADMISSION OF EVIDENCE—HARMLESS ERROR.**

Where, on a trial for homicide, two physicians, who had examined accused immediately after the homicide, testified that accused in their opinion was shamming unconsciousness, the error in permitting another physician to state the symptoms manifested by one shamming unconsciousness was not reversible.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 3138.]

10. Same—Opinion Evidence—Mental Incapacity—Witnesses—Competency.

On a trial for homicide, accused alleged that at the time of the killing he was laboring under such a defect of reason as not to know the nature of his act. A witness connected with a newspaper testified that accused had a short time prior to the homicide submitted a poem for publication. The witness had frequently seen accused. *Held*, that it was competent for the witness to state whether the acts and conversations of accused impressed him as being rational or irrational.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1045.]

11. Same.

Some time prior to the homicide accused had been instrumental in instituting proceedings for violations of the excise law, and during the course of the trial for such violations his testimony was taken down by the official stenographer of the court. The official stenographer testified that he had no personal acquaintance with accused, and had no recollection independent of his minutes of the manner in which accused gave his testimony. *Held*, that it was proper for the official stenographer to state whether or not the answers of accused to the questions propounded impressed him as rational or irrational.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1045.]

12. Same—Expert Witnesses—Hypothetical Questions.

A question asked a physician for his opinion as to the responsibility of one on trial for crime, which requested him to give an opinion based on the testimony as stated in the question, as well as his own examination of accused, was proper.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 1075, 1073, 1072.]

13. Same.

Where, on a trial for homicide, accused did not deny the crime, but claimed that it was accidental, or that he was laboring under such a defect of reason as not to know the quality of his act, evidence of his mental condition prior and subsequent to the homicide and at the time of the trial was admissible.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 760.]

14. Same—Appeal—Erroneous Admission of Evidence—Prejudicial Error.

Where, on a trial for homicide, the fact that accused had been engaged to marry decedent and that the engagement had been broken was admitted by accused, the admission of a letter written by decedent to a third person, stating that her engagement to accused was broken, was not reversible error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 3138.]

15. Same—Drunkenness—Defense.

Where a person, after previously determining to commit a homicide, voluntarily drinks intoxicating liquors until intoxicated, drunkenness is, under the express provisions of Pen. Code, § 22, no defense, though his condition may be considered in determining the intent with which he committed the crime.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 67.]

Appeal from Court of General Sessions, New York County.

William J. Koerner was convicted of murder in the second degree, and he appeals. Affirmed.

Argued before PATTERSON, P. J., and LAUGHLIN, HOUGHTON, McLAUGHLIN, and SCOTT, JJ.

K. Henry Rosenberg, for appellant.
Robert C. Taylor, for respondent.

McLAUGHLIN, J. The defendant was indicted for the crime of murder in the first degree; the indictment charging that on the 23d day of September, 1896, he willfully and feloniously killed one Rose A. Redgate. There have been two trials. The first resulted in a conviction of the crime charged in the indictment, but on appeal the judgment was reversed and a new trial ordered, upon the ground that error was committed in admitting certain evidence against the defendant's objection. People v. Koerner, 154 N. Y. 355, 48 N. E. 730. The second resulted in a conviction of murder in the second degree, and the defendant again appeals, challenging the validity of his conviction upon various grounds, but principally that errors were committed in the reception and rejection of evidence, and in considering them it is only necessary to refer briefly to some of the evidence set out in the voluminous record before us.

The fact that Rose A. Redgate, at the time stated in the indictment, was shot with a pistol in the hands of the defendant, and as a result of the injuries inflicted died within a short time thereafter, is not disputed by the defendant. He, however, does claim that the evidence adduced at the trial fairly established that the shooting was accidental; that his purpose was to commit suicide, and in endeavoring to do so he placed the pistol against his temple, when, to prevent his carrying out his intent, the decedent grasped the pistol and it was accidentally discharged. He also claims that when the shooting took place he was laboring under such a defect of reason as not to know the nature or quality of his act or that it was wrong. The evidence on the part of the people tended to establish that on the day the shooting took place the defendant went to the decedent's place of business, 27 Pine street, waited until she was through with her work, between 5 and 6 o'clock in the afternoon, and then went with her to Fourteenth street, between Sixth and Seventh avenues; that he there shot her three times, and two of the shots were fatal; that he had been acquainted with the decedent for some time, and their relations were of an affectionate character; that at one time they were engaged to be married, but that the engagement at the time of the shooting had been broken by reason of the opposition of her father to the marriage; that by reason of this opposition the defendant had told the father, if he did not marry the decedent, nobody else should; and that the shooting was the deliberate, willful, and intentional act of the defendant.

There was some evidence offered by the defendant to the effect that the pistol was discharged in decedent's attempt to wrest it from his hands; but, when all of this evidence is considered, I do not think it established or would have justified a finding that the shooting was accidental. The number of shots, the location of the wound, the position in which the deceased fell, and other facts surrounding the shooting, indicate to the contrary, and show that the pistol was intentionally discharged by the defendant. Much evidence was given— and, indeed, the defendant seems to have directed his attention prin-

cipally to establishing the claim—that at the time the shooting took place he was laboring under such a defect of reason as not to know the nature or quality of his act, or that what he did was wrong. The evidence bearing on this subject tended to show that some of his relatives on both sides of the family had been afflicted with insanity and confined in asylums or sanitariums; that he himself, when two years of age, was injured upon the head; that when he was five years of age he had scarlet fever, when eight years of age typhoid fever, and several years later received an injury which destroyed the sight of one eye; that for some time immediately preceding the shooting he had acted in an irrational way; that on the afternoon of the shooting he drank a pint of whisky and took 40 grains of phenacetine, in two 20-grain doses; that he wrote a letter to his landlady, indicating that he intended to commit suicide, and immediately following the shooting the defendant sank to the sidewalk in an unconscious condition, and so remained until after he had been taken to the hospital and restoratives applied.

At the conclusion of the trial the evidence on the part of the people tended to establish the defendant's guilt of the crime charged in the indictment and required the submission of that question to the jury, and, had it found a verdict of murder in the first degree, would have been sufficient to sustain the same, while that offered by the defendant, bearing on his mental condition at the time the shooting occurred, was such as to possibly justify the jury in finding that the defendant did not intentionally shoot the decedent. There being a sharp conflict in the evidence, therefore, as to the mental condition of the defendant at the time the shots were fired, it requires an examination of the various errors alleged, for the purpose of ascertaining whether or not substantial justice has been done.

First, it is claimed the defendant's constitutional and statutory rights were invaded, in that he was denied the right of counsel to fully participate in the trial. The record will be searched in vain to find any justification for the claim. After the jury had been out a long time, and had returned and requested the court to inform them whether "one juror can legally and conscientiously, if he believes in one degree, for the purpose of agreeing with the other jurors, in order to bring in a verdict, change his vote from a greater to a lesser degree," and the court had responded that the verdict of the jury should express the true and conscientious belief of each juror, the defendant's counsel requested the court to inquire whether the jury could possibly agree upon a verdict, which the court declined to do, and defendant excepted. The ruling was proper. The jury had not in any way signified, up to this time, that they would be unable to agree, nor had they made any request to be discharged; on the contrary, the question propounded would seem to indicate that 11 of the jurors had already agreed, and the twelfth had not agreed because he was in favor of a verdict in the first degree, while the others were in favor of a verdict in the second.

When the court declined to make the inquiry requested by defendant's counsel, he then moved to discharge the jury and was about

to state the grounds, when the court interrupted and refused to hear him, to which he excepted. The court very properly refused to hear defendant's counsel. The case was being considered by the jury. It had been summed up by the district attorney and defendant's counsel, and thereafter remarks by either, under the guise of a motion, would have been highly improper. And for the same reason the court properly refused, when the jury returned with its verdict, to hear defendant's counsel before the verdict had been received. If counsel had any just complaint that the verdict, when rendered, was improper, then he had an ample remedy to protect all the rights of the defendant. Code Crim. Proc. §§ 462–466. The protection of such rights were not necessary, nor did they justify acts which would prevent, in a measure at least, the orderly procedure of a trial. People v. Conlon (not yet officially reported) 101 N. Y. Supp. 597; People ex rel. Chanler v. Newburger, 98 App. Div. 92, 90 N. Y. Supp. 740.

Next it is claimed the jury was coerced into bringing in a verdict. The case was submitted to the jury at 4 p. m. March 9, 1898. They returned with their verdict at 1:40 a. m. March 12th, having deliberated a little over 57 hours. The trial had been a long one, and, while the jury had been out a considerable time, it must be borne in mind that they had not in any way intimated, until just a few hours before they finally rendered their verdict, that they could not agree. There is absolutely nothing to indicate that the court coerced the jury into finding their verdict. All that can be said is that they were out about 57 hours, and they had, a few hours before, intimated they would be unable to agree, and the court, with appropriate instructions, had requested them to make a further endeavor to reconcile their differences. This, under the circumstances, was eminently proper. Indeed, how long the jury should have been kept together rested in the sound discretion of the trial court. People v. Sheldon, 156 N. Y. 268, 50 N. E. 840, 41 L. R. A. 644, 66 Am. St. Rep. 564. In addition to this, the reason already suggested why the jury did not sooner agree is deserving of consideration. They did not agree because one of their number evidently refused to vote for anything less than murder in the first degree.

It is also claimed that the court erred in striking out of its own motion, and instructing the jury to disregard, a portion of the testimony given by the defendant's witness Caroe and proceedings in connection therewith. While the witness Caroe was testifying, the learned recorder discovered, or supposed he did, some one in the courtroom was indicating to the witness the manner in which he should answer the questions put to him, and he thereupon directed the district attorney to make an investigation of the matter by asking the witness certain questions. It undoubtedly would have been much better practice had the recorder directed the jury to retire while such questions were asked, and I am of the opinion he should have done so, lest the jury might possibly be unduly influenced by the recorder's action when they came to consider and weigh the testimony of the witness. But this was a matter resting largely in the discretion of the recorder; he taking into consideration what had occurred and the atmosphere

of the trial.  However, it seems to me clear, from what took place the following day, when the testimony was stricken out and the jury instructed, in language so plain they could not fail to understand it, that they were to disregard what had happened the day preceding, so far as the incident in question was concerned, that the defendant could not have been injured, and the action of the recorder does not constitute reversible error.  People v. Smith, 180 N. Y. 125, 72 N. E. 931; People v. Buchanan, 145 N. Y. 1, 39 N. E. 846; People v. Hayes, 140 N. Y. 484, 35 N. E. 951, 23 L. R. A. 830, 37 Am. St. Rep. 572.

Error is also claimed in the court permitting the people's witness Dr. Bayard to testify as to what symptoms are manifested by a person shamming unconsciousness.  The testimony given by this witness bearing on this subject ought to have been excluded, but it could not possibly have injured the defendant.  The question was:

"What are the symptoms manifested by a man who is shamming unconsciousness?"

The answer was:

"Probably will not speak, or give evidence of hearing the question, when he is spoken to.  He usually does not move.  He may.  If he is insensible to pain, he will not move when the stimulus to elicit pain is applied.  For ,the most part he would appear as though asleep.  I don't recall any more general symptoms than that."

It may be borne in mind that Drs. Harrison and Donovan, who had examined the defendant immediately after the homicide, had testified as to what symptoms were present, and each had stated that the defendant, in his opinion, was shamming.  When Dr. Bayard answered the question above quoted, it amounted to nothing which had not already been made to appear.  The answer, indeed, proved nothing. It was at most a mere expression of what a person "might" do, and would be doing violence to the intelligence of a jury to assume that they were misled by such answer, and thereby rendered an erroneous verdict.  People v. Mullen, 163 N. Y. 312, 57 N. E. 473; People v. Sutherland, 154 N. Y. 345, 48 N. E. 518; People v. Carpenter, 102 N. Y. 238, 6 N. E. 584.

It is also claimed that error was committed by permitting two lay witnesses, Kenneally and Osborne, to testify as to the rationality of the defendant.  Kenneally was connected with a newspaper published in the city of New York, to whom the defendant, a short time prior to the homicide, had submitted a poem for publication, entitled "Pisen Pete."  He had frequently seen the defendant; but, while he could not state precisely the time when the article was submitted, he did remember the fact that the defendant submitted it to him, at the same time stating that he wrote it.  Under such circumstances, it was competent for the witness to state whether the acts and conversation of the defendant impressed him as being rational or irrational.  As to the witness Osborne, he was one of the official stenographers of the Court of General Sessions.  The defendant, some time prior to the homicide, had been instrumental in instituting proceedings to punish certain persons for violations of the excise law, during the course of which his testimony was taken by the witness Osborne acting in his official

capacity.   While he testified that he had no personal acquaintance with the defendant, and had no recollection, independent of his minutes, of the manner in which he had given his testimony, nevertheless it was proper for him to state whether or not the defendant's answers to the questions propounded impressed him as rational or irrational.   Besides, if this could by any possibility have been error, it is insufficient, when the whole record is considered, to justify a reversal.   People v. Silverman, 181 N. Y. 235, 73 N. Y. 980.

It is further claimed that the court erred in permitting Dr. Newton to express his opinion as to the responsibility of the defendant.   An examination of the record shows that Dr. Newton first testified to his own examination, as a result of which he pronounced the defendant sane.   A hypothetical question was then put to him, in answer to which he again pronounced the defendant sane.   He was then asked whether he had heard all the testimony given at the trial.   This was objected to, and the objection overruled, and he was permitted to state that he had. He was not then asked to give an opinion based upon the testimony which he had heard; but it was whether, assuming that testimony be true, as stated in the hypothetical question, as well as his own examination of the defendant, he would pronounce him sane or insane.   The objection to the question, and the exception taken to the adverse ruling thereto, as to whether he had heard all the testimony given at the trial, is unavailing.   A similar question was asked in People v. Osmond, 138 N. Y. 80, 33 N. E. 739, and was held harmless.   Then came the following question.

"Q. Now, assuming that testimony to be true, as I have stated in the hypothetical question, and assuming, also, your own examinations of this defendant, made in the Tombs, in your opinion, was he sane or insane?   I mean the explanation as you have detailed them here to-day."

The question was objected to, the objection overruled, an exception taken, and the witness answered: " I believe he's sane."   It is clear the witness, in answering the question, did not base his answer upon the truth of testimony given during the trial, but only upon the truth of testimony as stated in the hypothetical question; that is, he assumed that the facts stated in the hypothetical question were true.   This seems necessarily to follow when, in answer to a question put to him on cross-examination, he stated:

"In answering this hypothetical question put to me by Mr. Osborne. my answer is based upon the facts as he stated them to me."

In People v. Truck, 170 N. Y. 203, 63 N. E. 281 a question somewhat similar was held to be proper.   The witness was required to, and did, give his opinion upon specific facts which were detailed, and there was, therefore, no necessity for repeating the hypothetical question at length.   People v. Krist, 168 N. Y. 19, 60 N. E. 1057.

Error is also alleged to have been committed in permitting Drs. Newton and Hamilton to testify, against objection and exception, to the several examinations of the defendant made by them intermediate the homicide and the trial.   No error was committed in this respect.   The defendant did not dispute the fact that the deceased came to her death from a bullet wound received from a pistol which he held.   What he

claimed was that the shooting was accidental, or that he was laboring under such a defect of reason as not to know the nature and quality of the act he was doing. Under such circumstances his mental condition prior, as well as subsequent, to the homicide, and at the time of the trial, was a proper subject for consideration by the jury, to the end that they might correctly determine whether or not his claim were true. People v. Hoch, 150 N. Y. 291, 44 N. E. 976.

It is also claimed that the court erred in permitting the witnesses Shedlock and Dr. Ward to testify as to the rationality of the defendant at a time subsequent to the homicide. The answer to this alleged error is found in the one already discussed as to Drs. Newton and Hamilton, and is fully covered by the opinion in People v. Hoch, supra. So far as the testimony of Dr. Ward is concerned, the appellant seems to complain because the court of its own motion struck it out. It would seem, from the opinion of the Court of Appeals, that the same thing occurred on the former trial; that Dr. Ward's testimony was first admitted, and then struck out, and it was held there was no error. People v. Koerner, 154 N. Y. 366, 367, 48 N. E. 730.

Finally, it is claimed the court erred in admitting People's Exhibits 6 and 7, a letter and envelope which the deceased sent to the wife of the witness Shedlock, stating, in substance, that her engagement to the defendant was broken. It is a little difficult to see what bearing this had on the issue which was being tried, unless it be to establish the fact that the engagement between the deceased and defendant was broken. But that fact was not disputed by the defendant. No claim was made by him to the contrary. However, I do not see how it could possibly have injured the defendant. Besides, it would seem that this same evidence was admitted on the former trial, and the Court of Appeals held that no error was committed.

In conclusion, I am satisfied, from a careful consideration of the voluminous record, that the defendant has had a fair trial, and no errors were committed which were sufficient to justify a reversal of the judgment. We are required, under section 543 of the Code of Criminal Procedure, to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. The decedent lost her life by the act of the defendant. There may possibly be some doubt—and the jury evidently thought there was, and gave the defendant the benefit of it—as to whether his act which caused her death was premeditated; but there can be no reasonable doubt, as it seems to me, that he was responsible at the time for the act. Every act of his on the day of and immediately prior to the shooting indicates that he had intelligence enough to appreciate what he was doing and to distinguish between right and wrong. It may be that he intended to commit suicide; but, if he did, his own acts would seem to indicate that he intended to kill Rose Redgate before he took his own life. It may be that he drank the pint of whisky and took the 40 grains of phenacetine; but, if he did so, it is quite evident that it was for the purpose of nerving himself to commit the crime which he did. If he had previously determined to commit the crime then voluntary drunkenness was no defense. His act was none the less criminal on

that account, although his condition might be considered in determining the purpose, motive, or intent with which he committed the crime. Section 22 Pen. Code; People v. Pekarz, 185 N. Y. 470, 78 N. E. 294; People v. Krist, supra.

I think the defendant was properly convicted, and the judgment appealed from should be affirmed. All concur.